LAMAR CREAMERY COMPANY, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7425. Promulgated April 30, 1947.

*S. G. Winstead, Esq.*, and *J. P. Jackson, Esq.*, for the petitioner.
*Irene F. Scott, Esq.*, *J. D. Bierman, Esq.*, and *R. E. Maiden, Jr.*, *Esq.*, for the respondent.

## OPINION.

BLACK, *Judge*: The question presented is whether petitioner is entitled to any relief from excess profits tax for the calendar years 1941 and 1942 under the provisions of section 722 of the Internal Revenue Code, as amended, the material provisions of which are in the margin.[2]

---

[2] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except * * *.

(b) TAXPAYERS USING AVERAGE EARNINGS METHODS.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * *

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

* * * * * *

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have

Under the statute petitioner must establish (1) that the tax computed without the benefit of section 722 results in an excessive and discriminatory tax and (2) a fair and just amount representing normal earnings to be used as a constructive average base period net income. See *East Texas Motor Freight Lines*, 7 T. C. 579. If petitioner establishes these two requirements, then the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income of $11,397.59 otherwise determined under the statute. In this particular instance the $11,397.59 was determined under section 713 (f) of the code. Petitioner's actual average base period net income for the four base period years was $5,593.92, but by reason of the provisions of 713 (f), commonly known as the "growth formula," it is entitled to use and has used as a credit in determining its excess profits tax for each of the taxable years an average base period net income of $11,397.59. In determining (2) above no regard shall be had to events or conditions affecting petitioner, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, with certain exceptions not applicable here.

We shall first consider whether petitioner has established (1) above. Under section 722 (b) the tax computed without the benefit of section 722 "shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because" of the existence of one or more of the factors thereafter mentioned in subsection (b). The parties agree that petitioner is entitled to use the excess profits credit based on income pursuant to section 713. The parties differ on whether petitioner has shown the existence of the factors mentioned in subsections (b) (2) and (4) of the statute.

We first take up petitioner's contention that it is entitled to relief under section 722 (b) (2). The essential elements of this subsection are: (1) the "business of the taxpayer" (or the business of the industry of which it is a member) must be "depressed"; (2) the depression of business must be caused by a temporary economic circumstance; and (3) such circumstance must be "unusual in the case of the taxpayer" or of its industry. Petitioner does not contend that the industry of which it was a member was depressed. Petitioner does contend, however, that under section 722 (b) (2) it has shown that its own business

commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. • • •

• • • • • • •

was depressed in the base period because of its competition with Carnation; that this competition was a temporary economic circumstance unusual in the case of petitioner; that if it had not been for this competition petitioner would not have suffered the losses at its Greenville plant and would not have had to pay as much for its ungraded B milk as it did pay; and that because of these things its average base period net income is an inadequate standard of normal earnings.

We find ourselves unable to agree with these contentions. It is true that when Carnation opened its plant at Sulphur Springs it paid more for milk than petitioner and other milk companies in that territory had been paying and as a result thereof petitioner had to pay more for its milk thereafter. But can such competition be considered as a temporary economic circumstance unusual in the case of petitioner or of the industry of which petitioner was a member? We do not think it can be so considered. Competition is present in almost any business. Instead of it being something unusual, it is quite common. It is of the very essence of our capitalistic system. Petitioner's competition with Carnation can hardly be considered as a temporary event, notwithstanding Harlan's testimony that it was temporary. Carnation had come to Sulphur Springs to stay. It built a plant at Sulphur Springs having a capacity four times that of petitioner's plant, and, in our opinion, it became in a very real sense a permanent competitor of the petitioner in the milk-buying field. We do not think petitioner has shown that its average base period net income is an inadequate standard of normal earnings because of the factors mentioned in subsection (b) (2), and we have so found as one of our ultimate findings of fact. See sec. 35.722–3 (b), Regulations 112; *Monarch Cap Screw & Manufacturing Co.*, 5 T. C. 1220; and *Fish Net & Twine Co.*, 8 T. C. 96.

Petitioner introduced in evidence a schedule showing a summary of milk prices per 100 pounds of 4.5 per cent butterfat test for the years 1936 to 1939, inclusive, paid by Meadolake Foods, Inc., of Sherman, Texas, one of its competitors. Petitioner also introduced a schedule showing a comparison of petitioner's average cost and Meadolake's average cost of ungraded milk purchased per 100 pounds of 4.5 per cent butterfat test. In view of our holding that on the facts petitioner has not proved its right for relief under section 722 (b) (2), we have not incorporated these schedules in our findings of fact, as it is believed they would serve no useful purpose. Petitioner does not claim these facts would be relevant under section 722 (b) (4), which we presently discuss.

*Section 722 (b) (4) Relief.*

Petitioner also relies upon section 722 (b) (4) and contends that it has shown that during the base period petitioner changed the character of its business by adding a new product in the form of ice cream mix,

so that its average base period net income did not reflect the normal operation for the entire base period; that petitioner's business did not reach, by the end of the base period, the earning level which it would have reached if it had made this change in the character of its business two years before it did so; and that because of this showing petitioner's average base period net income is an inadequate standard of normal earnings. We think the evidence offered by petitioner supports these contentions and we have so found in our findings. Section 722 (b) (4) provides in part that the tax shall be considered to be excessive and discriminatory if the taxpayer's average base period net income is an inadequate standard of normal earnings because:

(4) the taxpayer, either during or immediately prior to the base period * * * changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had * * * made the change in the character of the business two years before it did so, it shall be deemed to have * * * made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes * * * a difference in the products * * * furnished * * *.

In 1938 petitioner commenced to manufacture and sell ice cream mix on a quantity basis. We think this represented a difference in the products furnished and hence a change in the character of petitioner's business during the base period. Section 35.722–3 (d), Regulations 112, relating to "Commencement or change in character of business," reads in part:

* * * * * * *

A change in the character of the business for the purposes of section 722 (b) (4) must be substantial in that the nature of the operations of the business affected by the change is regarded as being essentially different after the change from the nature of such operations prior to the change. No change which businesses in general are accustomed to make in the course of usual or routine operations shall be considered a change in the character of the business for the purposes of section 722 (b) (4). * * *

A change in the character of the business includes changes resulting from the following activities:

* * * * * * *

(2) A difference in the products or services furnished. A product or service is different from another product or service if the trade custom or practice treats it as a product or service of a different class. A mere improvement in the product or service does not constitute a difference in the product or service. For example * * * Another taxpayer manufactured and sold a variety of products, some under patents it had developed. During the base period it engaged in extensive research, developed new products, perfected and obtained a patent, and employed new marketing methods, enabling it to sell a leading product never before sold in the new markets. A difference in the products furnished is deemed to have resulted.

We think the addition to its business by petitioner in 1938 of a new product, namely, ice cream mix in quantity production, brings petitioner within the ambit of the foregoing regulations. We think the same reasoning would apply here as we used in *7-Up Fort Worth Co.*, 8 T. C. 52, where we held that the character of taxpayer's business, that of a soft drink manufacturer manufacturing a drink called "7-Up," was changed by the addition of a new product, "Nesbitt's Orange Beverage."

It is not enough, however, for petitioner to establish merely that during the base period it changed the character of its business. It must also establish that "the average base period net income does not reflect the normal operation for the entire base period of the business." *East Texas Motor Freight Lines, supra.*

The actual earning level reached by petitioner in its ice cream mix department for the calendar year 1939, which was the last year of the base period, was $1,531.13. Petitioner contends that it has proved that, if it had made this change in the character of its business two years earlier, its operating profit from its ice cream mix department for the last year of its base period would have been $17,475.90. Harlan testified that in his opinion if the change had been made two years earlier petitioner would have manufactured and sold 3,000,000 pounds of mix during 1939. This estimated production of 3,000,000 pounds forms the basis for the calculation of a reconstructed profit in 1939 for ice cream mix of $17,475.90. During that year it actually manufactured and sold 994,834 pounds for $64,770.97, which was at the rate of $.0651073 per pound.

The respondent contends that Harlan's estimate of 3,000,000 pounds is not justified on the facts that were known at the end of the base period. In his brief the respondent insists "that any amount greater than 2,000,000 pounds is clearly and obviously unreasonable on the proof adduced." Petitioner actually manufactured and sold 490,515 pounds in 1938 and 994,834 pounds in 1939, which represents an increase in 1939 of 504,319 pounds over 1938. If this result had been pushed back two years and an additional two years added at the same rate of increase, the production for 1939 would have reached approximately 2,003,472 pounds. We are, therefore, of the opinion that Harlan's estimate of 3,000,000 pounds is too high. We think these figures are too optimistic when only facts existing at the end of 1939 are taken into consideration. And it is only these that we can take into account. We can not take into account the swollen demand which was created in the war years. It was this very sort of thing which Congress sought to avoid in the enactment of the last sentence of section 722 (a), to which we have already referred. Of this prohibition, House Report No. 2333, 77th Cong., 2d sess., had this to say at page 142:

In order to eliminate consideration of the effects of the war, it is provided that, in determining the constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, an industry of which it is a member, or taxpayers generally, occurring or existing after December 31, 1939. Thus high war prices, swollen demand, and other factors which would not be normal prior to the imposition of the excess profits tax shall be eliminated in the computation of the normal or average earning capacity of the taxpayer

We, therefore, agree with the respondent that the evidence does not warrant a finding of any amount greater than 2,000,000 pounds of ice cream mix at the end of 1939, and we have so found in our findings of fact. In arriving at the reconstructed operating profit on a production of 2,000,000 pounds, we have used the same selling price per pound of $.0651073 which petitioner actually experienced in 1939 on the sale of the 994,834 pounds. The respondent contends in his brief that we should find that of the 2,000,000 pounds, 490,515 pounds should be considered as if it had been sold to small counter freezers at $.0702662 per pound and the balance, or 1,509,485 pounds, should be considered as if it had been sold to ice cream manufacturers at $.0600896 per pound. The record does not support this contention. We think the evidence shows that the 2,000,000 pounds could have been sold for $.0651073 per pound and we have so found in our findings. As to the cost of sales, the respondent contends in his brief that for 2,000,000 pounds we should find an ingredient cost of $.049782 per pound, a processing cost of $.0035 per pound, and an operating cost of $.008 per pound. We think the evidence supports this contention and have made a finding to that effect. On the basis of these costs and a selling price per pound of $.0651073 we have found that the operating profit on 2,000,000 pounds would have been $7,650.60. This amount represents the earning level petitioner would have reached in its ice cream mix department by the end of the base period if it had made the change two years earlier. Since the amount is in excess of the actual earning level that was reached by the end of the base period, petitioner, under the statute, "shall be deemed to have  *  *  *  made the change at such earlier time."

Before it can be determined whether the average base period net income does reflect the normal operation for the entire base period, we think it is necessary to determine what the normal operation for the entire base period would have been on the assumption, which must be made, that the change occurred two years earlier, and then compare that normal operation with the average base period net income of $11,397.59.

We have found that on the assumption that petitioner would have manufactured and sold 2,000,000 pounds of mix in 1939, it would have manufactured and sold 1,506,600 pounds in 1936, 1,668,200 pounds

in 1937 and 1,934,920 pounds in 1938.[3] We have also found that the selling price per pound in 1938 was $.0708329. This was the actual selling price of the 490,515 pounds which petitioner actually manufactured and sold in 1938. We have also found that the selling prices per pound in 1936 and 1937 were $.0819089 and $.0824337, respectively. This is in accordance with Harlan's testimony to that effect and is in harmony with the average price of milk paid producers in the United States during those years as compared with the same prices paid in 1939. The parties are agreed upon the ingredient costs per unit set out in our findings. The processing and operating costs per unit which we have found in our findings are those suggested by the respondent and are substantially the same as the costs requested by petitioner, except that they are a little higher, due to our finding of a much lower production for those years than petitioner had requested. The evidence showed that those costs increased as production decreased and vice versa. These findings all add up to the result that, if petitioner had made the change two years earlier, an assumption which must be made, the normal operation of petitioner's ice cream mix business for the entire base period would have shown operating profits for those years of $8,620.01, $9,848.55, $17,703.93, and $7,650.60, respectively. When these amounts are added to petitioner's income from its other departments and compared with the average base period net income of $11,379.59, we think petitioner has shown that its average base period net income does not reflect the normal operation for the entire base period and that its average base period net income is an inadequate standard of normal earnings. It follows that its tax computed without the benefit of section 722 shall be considered excessive and discriminatory and we have so found as ultimate facts in our findings.

Much of what we have already found goes to the establishment of (2) mentioned at the beginning of this opinion, namely, a fair and just amount representing normal earnings to be used as a constructive average base period net income under section 722 (a). Petitioner has requested us to find that its constructive average base period net income to be used in lieu of its actual average base period net income for both the taxable years here involved is $37,536.39, computed as follows:

---

[3] This finding is arrived at by applying to 1939 poundage the ratio that production of ice cream in Texas during the years 1936, 1937, and 1938 bears to such production in 1939. This method was used by both petitioner and respondent in their reconstructions, as will be seen from the following quotation from respondent's brief: "The respondent has made a reconstruction of petitioner's sales of ice cream mix on the basis of sales of 2,000,000 pounds in 1939. The pounds sold in the years 1936, 1937 and 1938 are arrived at by the same method used by petitioner, i. e., applying to 1939 poundage the ratio that production of ice cream in Texas in the years 1936, 1937, and 1938 bears to such production in 1939." As both parties use the same general method in their suggested reconstructions. we have adopted it.

| | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| Net income as reported | $2,859.72 | $2,524.46 | $5,420.70 | $11,570.82 |
| Eliminate: | | | | |
|   Losses from operation of Greenville plant | 4,361.22 | 6,144.09 | | |
|   Actual profit from ice cream mix | | | 765.56 | 1,531.13 |
| Balance | 7,220.94 | 8,668.55 | 4,655.14 | 10,039.69 |
| Add: | | | | |
|   Excess cost of milk due to competition | 11,129.32 | 5,879.15 | 5,740.44 | 9,618.99 |
|   Constructive profit from ice cream mix | 18,251.63 | 20,614.95 | 30,850.84 | 17,475.90 |
| Constructive net income | 36,601.89 | 35,162.65 | 41,246.42 | 37,134.58 |
| Constructive average base period net income (general average) | | | | 37,536.39 |

The respondent, in his brief, while contending that petitioner has not established that it is entitled to reconstruct its average base period net income for Greenville book losses or the commencement of the manufacturing of ice cream mix, nevertheless argues that, even conceding that petitioner had established its right to both (b) (2) and (b) (4) grounds, its constructive average base period net income would be $11,787.51 to be used in lieu of the $11,397.50 allowed petitioner under section 713 (f). Respondent, in his brief, gives the details of his computation in arriving at the above figure of $11,787.51 constructive average base period net income, but they need not be set out here. Suffice it to say we do not agree with the computation of respondent, nor do we agree with the one which petitioner has made.

As disclosed in our findings of fact, we are unable to find that petitioner has established a constructive average base period net income of $37,536.39. Instead of this amount, we have found in the last paragraph of our findings that petitioner has established a constructive average base period net income for the taxable years 1941 and 1942 in the amount of $15,975.53. In making this finding, we have not permitted petitioner to eliminate the losses from the operation of the Greenville plant or to add as constructive net income any amount for excess cost of milk due to competition, as petitioner has done in its above computation, for the reason that in our opinion petitioner has not shown that its average base period net income is an inadequate standard of normal earnings because of the factors mentioned in section 722 (b) (2).

The respondent in his computation of the constructive average base period net income has added as "Constructive profit from ice cream mix" the amounts of $5,501.97 for 1936; $5,570.61 for 1937; $2,886.21 for 1938; and $2,606.98 for 1939. These amounts are considerably less than the amounts which petitioner contends should be added as constructive profit from ice cream mix, and we think they are too low. For reasons which we have already stated, we have found that the constructive profit from ice cream mix for each of the base period years was $8,620.01. $9,848.55, $17,703.93, and $7,650.60, respectively. We

hold that these amounts should be added in place of the amounts contended for by the parties. These computations have been made in our findings and, as there indicated, we have found that petitioner's constructive average base period net income to be used in computing credit in the taxable years 1941 and 1942 is $15,975.53 instead of $37,536.39 contended for by petitioner and instead of $11,787.51 computed by respondent in his brief.

In his brief the respondent suggests that, once having determined the constructive net income for the year 1939, "a much more reasonable approach to a reconstruction" for all the base period years would be to use a general business index method, as was done in *East Texas Motor Freight Lines, supra.* On January 23, 1947, the Excess Profits Tax Council E. P. C. 8, Internal Revenue Bulletin No. 6, page 4, refers to Mimeograph 5807, 1945 C. B. 273, and to our holding in the *East Texas Motor Freight Lines* case, and says in part: "Only when no better, more appropriate, data are available should a general business index be used." Petitioner has supplied that "better, more appropriate, data" in the instant case, namely, it has proved "detailed reconstruction of sales, costs, or expenses" (Bulletin, part V, subpart II (C) (4) (b) (i), page 110 and quoted in the *East Texas* case at 7 T. C. 594) for all the base period years. That being true, we are of the opinion and so hold that a general business index method should not be used in the instant case.

Petitioner's excess profits tax liabilities for the calendar years 1941 and 1942 should be redetermined by using a constructive average base period net income credit for both years of $15,975.53 in lieu of the actual average base period net income of $11,397.59 which petitioner used in its excess profits tax returns for those years.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*

