AVEY DRILLING MACHINE COMPANY, PETITIONER, *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT.

Docket No. 17783.    Promulgated June 11, 1951.

*Louis E. Brockman, Esq.*, for the petitioner.
*Irene F. Scott, Esq.*, and *Lester M. Ponder, Esq.*, for the respondent.

OPINION.

RICE, *Judge:* Petitioner seeks relief under section 722 of the Internal Revenue Code [1] on the ground that its excess profits taxes for 1940, 1941, and 1942 are excessive and discriminatory by reason of conditions or circumstances within subparagraphs (1), (2), (3) (A), and (4) of section 722 (b), and asserts that a fair and just amount representing normal earnings, to be used as a constructive average base period net income, is $136,800.

Petitioner is entitled to use the average earnings method of computing its excess profits credit. Its base period is the calendar years 1936 to 1939, inclusive. Its average base period net income, computed with the benefit of section 713 (e) (1), was $8,700.72 for the purpose of determining under the average earnings method its excess profits credit for 1940 and 1941, and $11,600.96 for determining its credit for 1942. Its excess profits credits, computed under the invested capital method, amounted to $28,954.27, $34,185.83, and $43,457.10, for the years 1940, 1941, and 1942, respectively.

### Section 722 (b) (1), Unusual Event. [2]

Petitioner alleges that in its base period normal production, output, or operation was interrupted or diminished because of an event un-

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. * * *

[2] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

* * * * * * *

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

(1) in one or more taxable years in the base period normal production, output, or operation was interrupted or diminished because of the occurrence, either immediately prior to, or during the base period, of events unusual and peculiar in the experience of such taxpayer,

* * * * * * *

usual and peculiar in its experience, namely, the Ohio River flood in 1937. Respondent concedes that the flood was an event such as is described in subparagraph (1), but denies that petitioner has shown that its average base period net income is an inadequate standard of normal earnings by virtue thereof. As respondent points out, if the entire amount, less than $12,000, specifically claimed as flood loss (proof of which is not conceded) were restored to income for 1937, the excess profits credit computed upon the average base period net income as so reconstructed would not equal the credits, computed under the invested capital method, which were used in determining Avey's excess profits taxes. Hence, it is not shown that the taxes are unjust and discriminatory by reason of the flood.

Petitioner concedes this, provided it is not entitled to relief under some other subparagraph of section 722 (b). However, if the right to relief under another provision is shown, relief under subparagraph (1) might enter into the computation of the constructive average base period net income. This will be discussed hereinafter in connection with the reconstruction of earnings.

*Section 722 (b) (2) [3] Depression from Unusual Economic Conditions.*

This subparagraph provides relief where a taxpayer's business was depressed from the effects of temporary unusual economic conditions peculiar to the taxpayer or to its industry. Petitioner asserts that such conditions affected its industry, a group of some ten or more builders of precision drilling machines. Respondent asserts that Avey is a member of the machine tool industry. Avey agrees with this, but contends that for purposes of comparison such industry is too broad a classification.

The respondent's published Bulletin on Section 722 states that a single large corporation having a monopoly may be an industry in itself. It further states, page 8:

In most general terms an "industry" comprises a group of business concerns sufficiently homogeneous in nature of production or operation, type of product or service furnished, and type of customers, so as to be subject to roughly the

---

[3] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

\*    \*    \*    \*    \*    \*    \*

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\*    \*    \*    \*    \*    \*    \*

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

\*    \*    \*    \*    \*    \*    \*

same external economic circumstances affecting their prices, volume and profits. Stated otherwise, an industry will generally consist of all of its producers which compete with each other in selling essentially the same products or services in the same market.

Petitioner's evidence indicates that there are five recognized arts involved in the machine tool industry, dealing with the processing of metal by five different means, namely, turning, milling, shaping, graining, and boring or drilling. There are more than 200 types and kinds of machine tools using these arts. Each of these arts, says the petitioner, is an industry of its own, and the builders of small precision drilling machines by themselves constitute an industry. There were some 10 or more companies in the group building this type of drilling machine and in the "trade" a "sensitive" drilling machine is defined as one boring a hole no larger than one and one-quarter inches. A drill of larger size is referred to as an upright drill, is sold in a different market, and is not ordinarily used in precision work. There is a difference in the kind of shops that will ordinarily use upright drilling machines and those using sensitive drilling machines. For example, a railroad repair shop would use an upright drill; a typewriter or adding machine manufacturer would require a sensitive drilling machine. According to respondent's own definition of an "industry" the term may properly be applied to a small group of manufacturers building the same type of product having the same end use and competing in the same market. A manufacturer of a wide variety of machine tools, meeting collectively a large part of the needs of machine tool users, might properly be considered a member of the machine tool industry as a whole. Such a manufacturer has a wide market for its products and would normally be subject to those economic influences affecting the bulk of the machine tool builders. On the other hand, a manufacturer of a highly specialized type of machine tool having a limited field of use might not be subject to the same economic influences. The market for such a type might expand or contract with an appreciable degree of variance from the market of the machine tool industry. Since there is evidence indicating that the builders of light precision drilling machines were subject to some economic influences which did not also affect the machine tool industry as a whole, we conclude that the "sensitive drilling machine builders group," which comprises Avey and its competitors, may be treated as Avey's "industry," and we have so found in our findings of fact.

A taxpayer may qualify for relief under subparagraph (2) if it establishes that its earnings were depressed as a consequence of temporary economic conditions peculiar to the taxpayer or its industry. This provision does not refer to ordinary economic hazards. The depression in earnings must result from unusual conditions over which the taxpayer has no control. The petitioner contends that during

the base period its earnings, as well as those of other builders of precision drilling machines, were depressed because the European countries then engaged in a rearmament race manufactured their own precision drilling machines and other light machine tools, with the result that American manufacturers of such machines received less export business. The argument is that petitioner and other manufacturers of small, light machinery, including precision drilling machines, and particularly such manufacturers having only a small volume of business, normally received a fair amount of business; that when the rearmament race started abroad the European countries concentrated their efforts and their own equipment on the manufacture of small, light machinery; and that, generally, they imported only heavy machinery from the United States, as heavy machinery could not readily be procured in Europe. This was a policy which petitioner and manufacturers similarly situated could not change. After the base period years the situation changed and petitioner, as well as other manufacturers in its group, received a large amount of export business. This base period condition, it is contended, was an unusual economic condition.

As petitioner points out, there was a strong upward trend in sales of machine tools in the base period years, an increasing part of which was foreign. Total shipments show an increase from $65 million in 1935 to $200 million in 1939 with foreign shipments increasing from about twenty per cent to about forty per cent of the total and amounting in 1939 to more than four times the 1935 shipments in dollar value. Foreign orders increased while domestic orders declined. Profits of machine tool builders as a whole showed a favorable percentage. On the other hand, shipments of precision drilling top units increased to 1937, but in 1938 declined to about one-third of 1937, and rose in 1939 to about half the 1937 shipments, with foreign shipments representing only some five per cent of the total in 1939. Net income of Avey's competitors was apparently not as favorable as net income of machine tool builders generally, in comparison with the long term average for the period 1922 to 1939.

Avey's total shipments increased in 1936 and 1937, dropped to less than half of 1937 in 1938, and increased in 1939 to about half of 1937, while Avey's foreign shipments averaged 10.3 per cent in the base period but declined from 1937 to 1939 in dollar value. In 1939 Avey's foreign orders increased rapidly in volume. Since shipments lag behind orders, this development did not serve to increase Avey's base period earnings, but did increase its earnings in the taxable years. Statistics of the National Machine Tool Builders' Association show that the larger machine tool manufacturers, generally speaking, secured the bulk of the foreign orders; smaller concerns, such as Avey,

having comparatively little of them. Petitioner argues that, had it and other manufacturers of light machinery secured foreign orders in the base period in accordance with the upward trend of the machine tool industry as a whole, its shipments would have amounted to $3,733,000 in the base period and that its loss of position compared to the increased business of the machine tool industry amounted to $2,084,000 in those years. Avey's actual shipments in the base period were about $1,650,000.

Preparation for war in Europe in the base period affected various businesses in different ways. Some derived increased earnings. Other suffered a shrinkage in their businesses from the diversion of funds into war channels or for other reasons. While the increasing volume of foreign orders for machine tools for war preparations doubtless served to swell the base period volume and earnings of some machine tool builders, it does not follow that manufacturers who did not share in this should be entitled to reconstruct earnings on the assumption that they should have received a part of such business.

We find it unnecessary to decide whether this buying policy was an unusual economic condition within the meaning of subparagraph (2), for, conceding for the purpose of this argument that it was, petitioner has not established the further requisite of a fair and just amount representing normal earnings of sufficient magnitude to provide an excess profits credit more favorable than its actual credits based upon invested capital. This matter will be discussed hereinafter in dealing with reconstruction of earnings.

### Section 722 (b) (3) (A),[4] Variant Profits Cycle.

Under this provision a taxpayer may be entitled to relief if its business is depressed as a result of conditions in its industry which subject the taxpayer to a profits cycle differing materially from the general business cycle in length and amplitude. This provision applies where the depression results from conditions usual in the industry, which conditions also exist in the case of the taxpayer, as distinguished from unusual economic conditions referred to in sub-

---

[4] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

    \*        \*        \*        \*        \*        \*        \*

    (b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

    \*        \*        \*        \*        \*        \*

    (3) the business of the taxpayer was depressed in the base period by reason of conditions generally prevailing in an industry of which the taxpayer was a member, subjecting such taxpayer to

    (A) a profits cycle differing materially in length and amplitude from the general business cycle, or  \*  \*  \*

paragraph (2). Petitioner contends that its business was depressed because of conditions generally prevailing subjecting it and other builders of sensitive drilling machines to such a profits cycle. Petitioner also contends that the machine tool industry, of which petitioner is also a member, likewise has a profits cycle at variance with the general business cycle.

It is essential to the establishment of a right to relief under this provision that the taxpayer's profits cycle differ materially in length and amplitude from the general business cycle. If this is not demonstrated, any variance that may exist in the cycle of the taxpayer's industry, as compared with the general business cycle, is immaterial. We think petitioner here has not shown a substantial variance in its own cycle from that of general business. Our findings include tables of index figures showing indices of the net profits of general business and Avey's net profits and net sales. The findings also show Avey's actual net profits and annual orders and shipments. A study of these figures reveals that the fluctuations in Avey's business conform closely to those of general business. These figures show a fairly steady rise from 1922 to 1929 with slight dips in 1924 and 1927, a sharp decline from 1929 to 1932 or 1933, a rise to 1937, a sharp dip for 1938 and a recovery in 1939; except that Avey's net loss in 1939 was greater than in 1938 even though it had more orders and more sales.

A temporary distortion due to some non-recurring cause would not create a variant profits cycle.[5] Avey's cycle appears to be of the same length as those of general business profits. Avey's business did not show as great a proportionate increase in the base period and three or four preceding years as was shown by general business profits. Even if this is interpreted as a difference in amplitude, that is not sufficient to meet the requirements of the statute, for the taxpayer's cycle must be shown to differ *both* in length *and* amplitude from the general business cycle. This is not shown here.

A further difficulty with the proof herein is that the alleged variance in the cycle of petitioner's industry is not shown to be due to conditions generally prevailing in that industry, either machine tools or precision drilling machines. See *El Campo Rice Milling Co.*, 13 T. C. 775, 787 (1949). Petitioner has no explanation for the supposed variance, if any exists, unless it flows from the abnormal lack of foreign demand mentioned hereinafter. If this is the cause, it is a temporary condition rather than a condition generally prevailing in Avey's industry, since Avey asserts in its claim under subparagraph (2) that it and its competitors had substantial foreign business in late 1939 and subsequent years. Avey has not established the existence of a variant profits cycle or that its base period earnings were depressed from conditions specified in subparagraph (3) (A).

---

[5] See respondent's Bulletin on Section 722, Part IV (B).

### *Section 722 (b) (4),* [6] *Change in Character of Business.*

Under this subparagraph petitioner alleges that it changed the character of its business just prior to and during the base period and that, as a result of such change, its average base period net income does not reflect the normal operation for the entire base period. A change in character includes a difference in the products. Petitioner's argument is that the new machines it developed and introduced just prior to and during the base period were not merely routine improvements, but embodied changes which revolutionized the industry. The changes effected in the machines were quite extensive and no such changes in Avey's models had been made during the 1920's or early 1930's, nor were any changes of similar degree made during the 10-year period following 1939. The process of development carried on during the period 1932 to 1939 resulted in the issuance of a number of letters patent applied for in the years 1935 to 1940, and granted in the years 1939 to 1942. The new machines differed from the earlier models in several particulars, the principal difference being that power was supplied by a motor mounted on the frame to drive each spindle, instead of being transmitted by a flat belt drive from an external source of power. The new type machines were considerably heavier than the old. They provided a wider choice of spindle speeds and were far more efficient in precision work. Their increased efficiency helped the customers by way of cost cutting and labor saving. The petitioner also developed a mechanism for withdrawing the drill from the work automatically to prevent choking and to remove chips. This was called the Avey-draulic feed and involved the principle of hydraulic circuits. Such development required several years and cost some $40,000 or $50,000 to develop. The mechanism could be installed in connection with a drilling machine in which case it represented a substantial addition to the cost. As a consequence of the

---

[6] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

\*    \*    \*    \*    \*    \*    \*

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\*    \*    \*    \*    \*    \*    \*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, \*  \*  \*

development of the new machines, Avey made sales to some 40 new customers generally similar in type to its other customers. The designing and building of the new type of machines required changes in manufacturing methods, a higher scale of costs and selling prices and the employment of electrical engineers and technicians not theretofore employed in Avey's business. Sales of the new machines rose to 66 per cent in number and 77 per cent in dollar volume of Avey's sales in 1939. Avey's orders were rapidly accelerating in late 1939, as shown in the findings of fact.

We think the evidence does not justify a conclusion that Avey "changed the character of the business" within the intent of the statute by reason of the invention and development of its new model machines. Avey, and other members of the machine tool industry, found it necessary to survival in business to do research and development to keep up with the demands of their customers and the improved products of their competitors. Avey's customers were demanding machines of greater spindle speed and Avey's development of improved machines was necessary to prevent loss of its business to competitors who were at the same time improving their machines to meet the same customer demand. The changes, we think, cannot be characterized as more than improvements. Avey was in the business of building precision drilling machines used to drill small holes in metal. The new machines served the same purpose as the old and, generally, were sold to customers in the same industries as before. A change in character, within the intent of the statute, must be a substantial departure from the preexisting nature of the business. The Avey-draulic mechanism may have been a development beyond anything Avey's competitors could match, but the record does not show what sales of this device resulted or could reasonably have expected to result from its development. As respondent says, had petitioner not made the improvements in its machines it could not have stayed in business.

Petitioner relies upon *W. B. Knight Machinery Co.*, 6 T. C. 519 (1946), in which a taxpayer in a section 721 proceeding proved that as a result of research and development it introduced a milling machine which was different from anything it had manufactured theretofore. Upon the evidence we concluded that because of the changes effected the new machines manufactured by the company were essentially different from the earlier models even though they were still milling machines and had the same end use in general as the earlier machines. They were adapted to perform work, both in kind and extent, which the old machines could not perform. The case is not in point because it involved a different question. The issue there was whether income in an excess profits tax year was "abnormal" income resulting from development of tangible property. No question of a change in character of the taxpayer's business was raised. It does not

follow that "development" which meets the requirements of section 721 (a) (2) (C) constitutes a "change in the character" of a business for the purposes of section 722 (b) (4).

Petitioner also cites other cases. In *East Texas Motor Freight Lines*, 7 T. C. 579 (1946), we held that a change in the petitioner's business occurred when, as a common carrier of freight by motor truck as an intrastate carrier, it changed its function to serve as an interstate carrier as well. In *7-Up Fort Worth Co.*, 8 T. C. 52 (1947), the business of the petitioner was that of bottling a soft drink known as "7-Up," and in December of 1939, it acquired the right to bottle and sell an orange beverage. We there recognized a change in the character of the business. In *Lamar Creamery Co.*, 8 T. C. 928 (1947), the petitioner added a new product, an ice cream mix, which we held satisfied the requirement for a difference in the products or services furnished. These cases are not controlling here where the change in product was an improvement, and not a radical change in function or addition of a new and different product.

### Reconstruction of Earnings.

Petitioner contends that the fair and just amount representing normal earnings, to be used as a constructive average base period net income is $136,800. This is based upon the assumption that a normal sales level would have amounted to about $1,000,000 per annum by the end of 1939 on which the profit would be $150,000. To this figure is applied an index of 91.2 per cent to reach the amount stated. This amount is further reduced by adjustments for income taxes in each of the years 1940 and 1941 which adjustments petitioner says may be cared for under Rule 50.

The president of petitioner expressed his opinion, based upon the progress of the sales of the new machines and an analysis of such sales and assuming that the machines had in each instance been introduced 2 years earlier and on the further assumption that the company was enjoying a normal period of business, and that there had been no flood and no depression because of temporary economic conditions or cyclic variations, that Avey's sales would have reached $1,000,000 in 1939 and its net income would have been $150,000.

The opinion expressed by Avey's president was responsive to a hypothetical question which assumed the existence or nonexistence of certain facts and conditions, among these the existence of a change in the character of the business and the existence of a variant profits cycle. We have decided that there was no change in the character of the business and that Avey's profits cycle did not differ materially from the general business cycle. To the extent the opinion was based upon these hypotheses, it was without substantial foundation.

The secretary of the National Machine Tool Builders' Association expressed the opinion, based upon a study of Avey's orders and shipments in comparison with those of the machine tool industry, that if Avey's foreign shipments had continued in the base period to hold their relative position with those of the industry, Avey would have had additional sales of $2,084,000 in the base period. This figure was computed by statistical methods.

This opinion involves, we think, a fundamental error. The petitioner's own argument is that the foreign sales of the machine tool industry in the base period were abnormally concentrated on heavy types because of the rearmament race, that the war preparations created an unusual economic condition.

The machine tool industry's foreign shipments in 1936 were higher in dollar value than in any prior year shown in the record and increased greatly each succeeding year throughout the base period, much of the increase being due to war conditions in foreign countries. This proposed computation of Avey's constructive sales appears to assume that Avey should share pro rata in these war orders. While the base period was one of recovery from the depression years preceding, and some increase in foreign sales could be expected in normal conditions, we think the assumptions upon which a reconstruction of normal income must be predicated may not include an assumed sharing in the war use sales.

Where a taxpayer has an earnings experience, any reconstruction of earnings must bear some relation to that experience. Avey's asserted loss of foreign orders in the base period presents a problem of reconstructing the foreign sales it might have had if the abnormal condition were not present. Avey's foreign sales averaged about $36,600 for the whole period 1922–1939. The highest year was 1928 when foreign sales were about $103,700. The highest foreign sales for a period of 4 years was $352,000 for the years 1927 through 1930, an average of $88,000. Foreign sales in the base period were about $190,500, an average of $47,615. No warrant has been shown for assuming that "normal" earnings should include foreign sales greatly in excess of any in Avey's prior experience.

If a reconstruction of earnings is made by assuming base period foreign sales of $352,000, an increase of $161,500, over actual foreign sales, and net profits on the additional sales are calculated at 15 per cent, the rate assumed by Avey's president in his estimate based upon much greater assumed sales, the gross addition to base period income is $24,225. The entire amount claimed as flood loss was slightly under $12,000. If $12,000 were added on this account, the increase to actual base period net income amounts to $36,225, or an average of $9,056.25. Reconstruction by increasing the actual base period net income by this

amount will not produce as large an excess profits credit as that actually used under the invested capital method in computing Avey's excess profits taxes.

If reconstruction is based upon the average of Avey's earnings for the long term 1922 through 1939, the amount thereof, about $20,800, is likewise insufficient to produce a credit equivalent to the credit under the invested capital method. The petitioner argues that in any such reconstruction the depression years of 1931 to 1934 should be omitted, giving an average of over $62,000. These depression years involved losses totaling $264,000. We find no sanction for selecting favorable years and omitting depression years in arriving at a long term average. We have held that where average base period income exceeds the average of the long term 1922–1939, the base period average is not an inadequate standard of normal earnings. *Foskett & Bishop Co.*, 16 T. C. 456; *Industrial Yarn Corporation*, 16 T. C. 681.

We conclude from all the evidence, that petitioner's excess profits taxes, as computed without the benefit of section 722, are not excessive and discriminatory, and that petitioner has not established a right to relief under section 722.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*

---

MURDOCK, *J.*, dissenting: The petitioner manufactured and sold a type of drilling machines prior to 1935 which was not self-powered. The purchaser of one of those machines had to supply a separate power plant to cause the machine to operate. That power plant was not a part of the machine as manufactured and sold by the petitioner. The petitioner had been working on a machine which would include its own power plant in the form of an electric motor mounted on the top of the machine. The petitioner actively marketed those machines for the first time in 1935, and further improvements were made on them during the base period. Also, the petitioner pioneered in the development of a special-purpose machine for drilling deep holes and actively marketed such a machine for the first time in 1937. The findings indicate that no similar machine had been marketed previously. Improvements continued through 1939. The petitioner expended over $67,000 in developing the machine which included its own power plant, and it expended between $40,000 and $50,000 in developing the deep-hole drilling machine. No similiar changes in its products occurred between 1920 and 1949. Patents were obtained on the machines. The designing and building of the new-type machines required many changes in manufacturing methods and the employment of electrical engineers and technicians not previously employed in the business.

The machines had important advantages over the old ones. New customers were obtained. Sales of the new machines increased as improvements were made on them during the base period.

Section 722 (b) (4) provides that the tax without the benefit of section 722 shall be considered excessive and discriminatory if the average base period net income is an inadequate standard of normal earnings because the taxpayer either during or immediately prior to the base period changed the character of its business and the average base period net income does not reflect the normal operation of the business for the entire base period. It further provides that a change in the character of the business includes a difference in the products furnished. Those relief provisions should be interpreted in the light of the general purpose which Congress had in mind in enacting them. Furthermore, as Congress has suggested, they should be administered sympathetically in order to carry out the general purpose. Congress intended that the high excess profits taxes which it imposed during the war years should apply only to the excess of income of each year over the portion of its income for that year which might fairly be regarded as normal. One method of determining what was normal was to compute a credit based upon the average excess profits net income for the years 1936 through 1939. Congress recognized that there would be some cases in which that base peroid would not be a fair means of determining normal income of the business actually in operation during the later tax year. One of the exceptions, as set forth in section 722 (b) (4), is where the sales during the high-tax war year include sales of a product which the sales of the base period do not adequately reflect, due to the fact that immediately prior to the base period or during the base period a difference occurred in the products furnished.

The Commissioner by his regulations and this Court by opinions have pointed out that not every difference in the products furnished is sufficient to bring a taxpayer within section 722 (b) (4). But obviously the provision should not be written out of the statute, and neither the Commissioner nor this Court should take a narrow view of what is a difference in the products furnished, within the meaning of section 722 (b) (4). The prevailing opinion interprets the word too narrowly. It seems to find something against the petitioner's contention in the fact that, not only the petitioner, but other members of the industry, in order to survive and to meet competition, had to keep up with the demands of their customers. It holds that the change must be a substantial departure from the preexisting nature of the business and describes the new machines as mere improvements, since they "served the same purpose as the old and, generally, were sold to customers in the same industry as before." I do not agree with

those reasons, and believe that they have led the majority to find incorrectly as a fact that no change in the business occurred.

The majority would distinguish *7-Up Fort Worth Co.*, 8. T. C. 52, and *Lamar Creamery Co.*, 8 T. C. 928, because here "the change in the product was an improvement, and not a radical change in the function or addition of a new and different product." That is a distinction without any substantial difference. The taxpayer in the first case began to sell a new beverage, but it "served the same purpose as the old and, generally, [was] sold to the same customers in the same industry as before." The situation in the other case was similar in principle. The deep-hole drilling machine actually served a purpose which was not served by any prior machine.

A parallel to the introduction of the self-powered machine is furnished by the advent of the automobile. Studebaker, for example, had long manufactured vehicles, the purpose of which was to transport persons and things from one place to another. However, they would not fulfill that purpose until the purchaser supplied a power plant, usually in the form of a horse or a mule. It was later found that a power plant in the form of a gasoline motor or electric batteries could be incorporated in the vehicle so that it would move under its own power. Studebaker began manufacturing and selling such vehicles. But even the majority must concede that they were a different product. Yet there, as here, the product first manufactured and sold was just a machine which had no power plant incorporated in it and would not operate until outside power was applied, whereas later the thing manufactured and sold was a machine which had as an integral part of it the power plant to make it operate. There was in both not a mere improvement, but a real, substantial difference in the products furnished, although they "served the same purpose as the old and, generally, were sold to customers in the same industry as before."

Here, normal sales of neither of the new products, the self-powered drills and the deep-hole drills, are reflected over the base period years; the average base period net income does not reflect the normal operation of a business, including the sale of such machines, for the entire base period; and this seems a proper case in which to hold that there was a change in the character of the business due to a change or difference in the products furnished. Whether its constructive average base period net income would be sufficient to give it any relief is another question.

KERN, *J.*, agrees with this dissent.