OPINION. Black, Judge: The respondent has recognized the existence of a qualifying factor under section 722 (b) (4) and has made a partial allowance of petitioner’s claim for relief. He has used a cabpni of $15,472[9] in determining the excess profits tax for the year 1942, in lieu of petitioner’s abpni of $19.88 computed under section 713 (f). The petitioner contends in its petition that a cabpni of $59,486.70[10] should be used. The question, therefore, is, has the petitioner established that “a fair and just amount representing normal earnings to be used as a cabpnt for purposes of an excess profits tax” is in excess of the amount determined by the Commissioner. The petitioner qualifies for relief under section 722 (b) (4) since it commenced business during the base period on March 14,1937, and since the respondent has recognized that its abpni is an inadequate standard of normal earnings. Cf. Victory Glass, Inc., 17 T. C. 381 (1951). Throughout the base period, the petitioner and its predecessor, which commenced business on September 16, 1935, were engaged as intrastate and interstate carriers of passengers by bus between Memphis and Texarkana via Little Lock and Hot Springs, a distance of 315 miles. The petitioner’s predecessor had certificates from the various State authorities that entitled it to operate over the route. These were all transferred to the petitioner when it commenced business. The Motor Carrier Act of 1935, was approved on August 9, 1935, and its provisions became effective October 1, 1935. It provided, inter alia, that carriers in interstate commerce were required to acquire a certificate of convenience and necessity from the I. C. C. Under the grandfather clause, carriers in operation on June 1, 1935, could acquire a certificate without further proof of convenience and necessity. It also, in effect, provided that carriers which commenced operations after June 1, 1935, but prior to October 15, 1935, could, if they filed an application for a certificate, continue to operate until the I. C. C. ordered otherwise. The petitioner’s predecessor filed an application for a certificate, and since it commenced operations between June 1, 1935, and October 15, 1935, it was entitled to continue until the certificate was denied. The I. O. C. granted a motion substituting the petitioner for its predecessor. After an extensive hearing, an order granting the certificate was filed on November 14,1938; however, Missouri Pacific, the principal protestant, objected to the granting of the certificate and the case was reopened. The I. C. 0. finally granted the certificate in 1940. As stated previously, the petitioner and its predecessor were entitled to operate during the base period, and they did operate throughout the base period without any interference, except for the I. C. C.’s denying it the right to operate locally between West Memphis and Memphis. Petitioner’s predecessor began operation with elongated Ford sedans that seated 11 passengers. These were replaced by 16-, 19-, and 21-passenger buses starting in 1937. In 1938 and 1939, it acquired 25- and 29-passenger buses. By the end of the base period it only used these new larger buses on its Memphis to Texarkana route. The petitioner was fully represented in the Red Book and the Green Book, which were official publications of the buslines for Forth America and the southwest region (the region where petitioner was located), respectively. These publications contain information relating to terminals, schedules, timetables, and, in some instances, tariffs. The petitioner, however, was not fully represented during the base period in the publication of the Rational Bus Traffic Association, which contained the official tariffs for the industry. These publications are used by ticket agents throughout the country in routing passengers on other carriers to places beyond where their own carriers travel. The petitioner’s predecessor had meager terminal facilities when it commenced operations but by the end of the base period the petitioner acquired its own separate terminal in Little Rock on a 5-year lease and had improved the property at a cost of not less than $8,350, and had arrangements for operating out of the terminals of other major carriers at the other main stops on its route. The petitioner carried on interchange with all of the major connecting carriers, except Missouri Pacific which specifically refused to accept any tickets for passengers over its lines if such tickets also contained a routing over petitioner’s line. Missouri Pacific, the petitioner’s principal competitor, commencing in 1929, operated over the shortest and most direct route from Memphis to Texarkana and also over the exact route that petitioner used. In addition, Missouri Pacific had many other routes out of Little Rock and operated in 10 States. Missouri Pacific had long supplied its interconnecting carriers with substantial interchange revenue in exchange for which such interconnecting harriers routed their continuing passengers over the Missouri Pacific lines. After the petitioner’s predecessor commenced operations Missouri Pacific, which up to that time had been rendering inadequate service and had been using old equipment, put all new equipment on its route between Memphis and Texarkana. The petitioner’s abpni was only $19.88. The petitioner claims that its low base period earning was due to the lack of a certificate of convenience and necessity, i. e., if the certificate were denied it would have to cease interstate operation and its investment would be worthless ; its financial backer, Rebsamen, would not invest in new equipment and terminals; it could not secure full representation in the publication which contained the official tariffs for the industry; and interconnecting carriers were reluctant to enter into interchange agreements. Petitioner argues that it is entitled to assume that it had a certificate in reconstructing its base period earnings since under the 2-year push-back rule it is deemed to have commenced business on March 14,1935, rather than March 14,1937; if it had commenced business on March 14, 1935, it would have been operating on June 1,1935, thereby entitling it to a certificate under the grandfather clause of the Motor Carrier Act of 1935, without the prolonged litigation to which it was subjected. On the basis of these contentions petitioner contended in its petition that it was entitled to a oabpni of $59,486.70 as against the $15,472 allowed by the Commissioner in his deficiency notice. Petitioner now argues in its brief that we should allow a oabpni of $68,188.86. We think that the petitioner has unduly emphasized the role that the lack of a certificate played in its base period difficulties. The record shows that by the end of the base period the petitioner was using only new large buses on its main route from Memphis to Texarkana and that its terminal facilities were comparable to those of other carriers, except for Missouri Pacific. The petitioner was continuously fit, willing, and able to provide such funds and equipment as were necessary properly to continue its services as an interstate carrier of passengers between Memphis and Texarkana. Also, the petitioner could operate over 99 per cent of its route without the need of a certificate from the I. C. C. This indicates that the lack of a certificate was not the sole or the principal cause of petitioner’s base period difficulties.[11] Conversely, it appears that competition of Missouri Pacific, in addition to that afforded by the other motor carriers and railroads, was a cause of petitioner’s difficulties. This competition is not a basis for relief. Cf. Lamar Creamery Co., 8 T. C. 928, 939 (1947). Petitioner’s contention for a oabpni of $68,188.86 is largely based on the testimony of M. E. Moore, its former general manager, that if certain things had happened prior to the end of petitioner’s taxable year 1939, it would have attained a net income by December 31, 1939, of $75,000. Moore testified that in March 1937, when he became general manager of petitioner, he estimated that petitioner would reach a net income of $75,000 for the year ending December 31, 1939, provided the following things happened: That the certificate of public convenience and necessity with the I. C. C. would be cleared up and that by December 31, 1939, petitioner would have its certificate; that it would obtain adequate terminals; that it would get adequate equipment and would be able, as a result of these things, to establish reasonable and permanent connecting carrier relations and get its tariffs properly set forth in the publication of the National Bus Traffic Association so that it could participate in through rates. As we have already said, the record shows that some of the things upon which the witness Moore laid emphasis had already happened by December 31, 1939. Even if it be assumed that all of the things which the witness emphasized had happened prior to December 31, 1939, including the granting of the certificate of convenience and necessity, we are convinced that there would have been no likelihood at all that petitioner would have attained a net income by that time of $75,000. We have carefully examined the record, including the stipulated facts, the numerous exhibits thereto, and the testimony of petitioner’s witness Moore. After doing so, we have reached the conclusion that petitioner’s cabpni to be used for 1942 is somewhat in excess of the $15,472 allowed by the Commissioner in his deficiency notice. We have concluded that figure should be $22,000, and we have so found in our Findings of Fact. That amount should be used in a recomputation under Eule 50, instead of the $15,472 which the Commissioner has used in his deficiency notice. Adjustments to the cabpni for 1942 of $22,000 should be made as indicated in our Findings of Fact in the determination of the carryover of unused excess profits credit which petitioner is entitled to bring over from its taxable years 1940 and 1941. Reviewed by the Special Division. Decision will ~be entered wider Bule 50. The respondent has applied the variable credit rule and has used CABPNI’s of $13,997.33 and $14,964.32 for 1940 and 1941, respectively, for the purpose of determining any unused excess profits credit carryover from these years to the year 1942. In its brief tbe petitioner contends for a CABPNI of $68,188.86. Also, tlie acquisition of Jeff’s Taxi Line, which had an Interstate certificate for operations between West Memphis, Arkansas, and Memphis, Tennessee, made it possible for petitioner to operate over its S15-mile route even if its application for a certificate was denied.