OPINION. Opper, Judge: Petitioner contends that it is entitled to excess profits tax relief under section 722(b) (2) because its business was depressed during the first 3 years of its base period by reason of the dumping on the domestic market of unusually large quantities of Norwegian sardines for sale at prices with which the Maine packers could not economically compete. It also contends that its business was further depressed because of the scarcity of fish and the resulting small pack of sardines in 1938, although it does not specifically advance this as a separate ground for relief. Petitioner claims that its fiscal year ended March 31,1940, was a normal year[1] and it seeks to use that period as the basis for computing a constructive income for the other base period years. Competition from imported sardines, and particularly the Norwegian musse, has generally been a factor in the Maine sardine industry. The Norwegian imports of all grades of sardines were approximately 50 per cent of the Maine production in 1924 and remained at about that proportion or greater until 1940. For the most part, however, the competition has been between the lowest priced of the Norwegian imports, the musse, and the key grade, or highest priced, Maine product. Until the early 1930’s the keyless grade, the lowest priced Maine product, which accounted for about 75 per cent of Maine production, sold for about half the price of the Norwegian musse, and hence was not seriously affected by Norwegian competition. Petitioner contends, however, that the prices and sales of keyless sardines were nevertheless determined by the prices of the Norwegian imports, because when the margin between the prices of the domestic keyless and the imported musse grades narrowed to a certain point consumers switched to the Norwegian sardines. Such a condition may have existed in 1931 and 1932 when, due to devaluation of the krone in 1931 and perhaps to other contributing general economic causes, the Norwegian musse sold at nearly as low a price as the Maine keyless grade. We have no figures on the actual import prices for years prior to 1935. The Norwegian imports rose from 17,194,025 pounds in 1930 to 19,449,312 pounds in 1931, and to 29,833,131 pounds in 1932, the highest since 1922; while Maine production fell off from 30,933,804 pounds in 1930 to 19,824,942 pounds in 1931, and to 12,131,005 pounds in 1932. The ratio became more normal after the devaluation of the dollar in 1934. In 1935 the Maine production was 37,220,647 pounds and the Norwegian imports 24,464,187 pounds. The domestic production and imports remained at about that proportion until 1940, except for 1938 when, as disclosed in our findings, the failure of fish supplies reduced the Maine production to 15,170,432 pounds. In that year, however, the Norwegian imports were only a little more, 15,849,563 pounds. Moreover, petitioner had large inventory carryovers in 1937 and 1938, amounting to over 71,000 cases in each year, as against an average inventory for the 4 preceding years of less than 20,000 cases. The inventory was reduced to 8,346 at the end of 1939. The evidence lacks support for petitioner’s contention that the price of Norwegian imports always determined the price and production of Maine sardines. There is no consistent pattern of conformity of the variation of prices or production of the domestic with the imported products. For example, the imports and domestic production were about equal in 1931 when Norwegian imports were selling at almost domestic prices and were again about equal in 1938 when import prices were about twice those of the Maine products. Again, when Norwegian imports increased from approximately 18 million pounds in 1934 to 24,464,000 pounds in 1935, domestic production increased at about the same ratio from approximately 27,590,000 pounds to 37,220,000 pounds. We do not know what portion of the Norwegian imports consisted of the competitive one-layer musse and what portion of the noncompetitive high-priced bristling. According to the 1948 United States Tariff Commission report quoted in our findings, before the onset of the war in 1939 the high-priced sardines constituted from 75 to 90 per cent of the total imports and no more than 5 per cent of the total domestic production was of comparable grades. The Norwegian imports having a value not exceeding 9 cents a pound, and subject to the increased duty of 44 per cent, amounted to only 2,066,455 pounds in 1934, as against approximately 14 million pounds of the higher grade imports, and became negligible after 1936. The cutthroat competition of which petitioner complains was actually in the early base period years among the Maine packers and brokers rather than between them and the Norwegian importers. This is established beyond question by the large volume of correspondence between petitioner and its principal brokers extending over the entire base period. The brokers kept petitioner informed about the grades offered by rival brokers and jobbers and were constantly urging petitioner to reduce its prices to meet this competition. Some of the brokers cut their brokerage fees, or offered rebates to purchasers, or used other extreme methods of obtaining business. The correspondence in a few instances contains casual references to the Norwegian imports, but not as seriously affecting petitioner’s market or prices. One of petitioner’s officers testified that the price cutting among the Maine packers was always present in the industry. Any competition that the Maine packers encountered during the base period from the Norwegian imports was not a temporary or unusual circumstance. It has varied in intensity from time to time according to prevailing economic conditions, but, as petitioner recognizes, has always been present as a vital factor in the Maine sardine industry. Such competition does not meet the requirements of section 722(b) (2) and Eegulations 112. Fish Net Twine Co., 8 T.C. 96; Lamar Creamery Co., 8 T.C. 928; Winter Paper Stock Co., 14 T.C. 1312; Democrat Publishing Co., 26 T.C. 377. And this would be true even though the competition were unusual or temporary, Democrat Publishing Co., supra, or came from foreign rather than domestic sources. Fish Net & Twine Co., supra. A comparison of petitioner’s operations over the base period years with those of prior years does not reveal any notable depression in its volume of business or earnings in any of the base period years except its fiscal year ended March 31, 1939. Since petitioner did not commence business until August 1932, the comparison of its base period operations with its pre-base-period experience may lack significance. But no other comparable packer existed, at least as far as petitioner’s evidence is concerned. Moreover, it is the nature or cause of any base period depression, whatever may have been its measure, with which we are chiefly concerned. Changes in international monetary exchange rates or other official action, which seem to be the principal causes for petitioner’s complaint, are not qualifying factors for excess profits tax relief under section 722, to say nothing of their virtual neutralization by other counteracting governmental measures. We said in Seekonk Lace Co., 24 T.C. 552, 563: Boül the devaluation of the franc and the reduction in the duty rates were the result of the interplay of world-wide economic conditions. They were governmental actions taken to implement national economic policies to ameliorate those conditions. Governmental actions, even where they have a direct impact on a taxpayer’s business, are not the basis for relief under section 722. Acme Breweries, 14 T.C. 1034; Packer Publishing Co., 17 T.C. 882, 897; Norfolk & Chesapeake Coal Co., 18 T.C. 904. Petitioner refers to the failure of the fish supply in 1938, during its fiscal year ended March 31, 1939. In that year the Maine pack was only a little more than half of normal and petitioner’s operating profits were proportionately even lower. Without pausing to discuss the classification of this factor as an “economic event,” see S. N. Wolbach Sons, Inc., 22 T.C. 152, the evidence affords no basis for a reconstruction of petitioner’s operations for that year, relative to a normal supply of fish; nor for assessing the reciprocal effect of petitioner’s large inventory carryover. Petitioner’s treasurer and general manager gave it as his opinion that to adjust for the 1939 low earnings, petitioner’s profits for that year should be increased by not less than $20,000. As noted in our findings, respondent in his computation of petitioner’s excess profits credit under section 713(f) has increased petitioner’s average base period income by $19,588.35. That amount would consequently equalize for that year as well as the other 3 any detriment which petitioner might conceivably have suffered by reason of the short pack in fiscal 1939. Petitioner is not entitled to section 722 relief where section 713 (f) benefits make it unnecessary. Homer Laughlin China Co., I T.C. 1325. Reviewed by the Special Division. Decision will be entered for the respondent. More than half of fiscal 1940 was subsequent to the outbreak of war In Europe. It Is difficult to see how viewing the entire year as normal would comport with the purpose of section 722. Fezandie & Sperrle, Inc., 5 T.C. 1185.