THE NIELSEN LITHOGRAPHING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 28508.    Promulgated December 31, 1952.

*Joseph H. Crown, Esq.*, and *Harry Janin, C. P. A.*, for the petitioner.
*Lester M. Ponder, Esq.*, and *Lyman G. Friedman, Esq.*, for the respondent.

608

OPINION.

Johnson, *Judge:* Petitioner alleges that under section 722 (b) (4) the character of its business was changed by a change in the operation of its business. The change in operation involved the installation of photo-mechanical equipment to produce zinc press plates, thereby eliminating the hand-transfer process for making these plates. Petitioner contends that operating economies were achieved by the installation of this new equipment, and that reduction in costs increased the income, thus entitling it to relief under section 722 (b) (4). Petitioner claims that its actual average base period net income is an inadequate standard of normal earnings because its entire base period did not reflect the operating economies resulting from the installation of new equipment.

Section 722 (b) (4) provides that the excess profits tax shall be considered excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, "if its average base period net income is an inadequate standard of normal earnings because * * * the taxpayer, * * * during * * * the base period, * * * changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business." It further provided that "the term 'change in the character of the business' includes a change in the operation * * * of the business."

It is conceded that petitioner is entitled to use the excess profits credit based on income pursuant to section 713. In accordance with orderly procedure we shall first consider whether there was a change in the operation of petitioner's business.

In October 1938 petitioner ordered a photo-composing machine with its necessary equipment and accessories at an aggregate cost of $13,248.49. This equipment was installed and ready for operation on or about March 1, 1939. The new equipment enabled petitioner to make zinc press plates by a mechanical means, and thus eliminate the manual processing of these plates. The preparation of the press plates under the photo-mechanical process required less than one-third of the time necessary under the hand-transfer process. The photo-mechanical process required about half the labor force that was utilized in the hand-transfer process. The more rapid production of the press plates, coupled with the reduction of the labor force, resulted in substantial operating economies. Furthermore, with this new equipment it was possible to produce a product superior to that produced by the hand-transfer method.

The regulations provide that a similar change would be within the scope and intent of the Code.

* * * In 1937 Corporation B engaged in coal mining converted from a system of hand loading, under which it had lost money, to a mechanized loading which reduced operating costs and resulted in profits; a change in operations has occurred. * * * [Regulations 112, section 35.722-3 (d)].

We have also held in other situations that a change in the method of purchasing brandy, *Beringer Bros., Inc.*, 18 T. C. 615, the change of a radio station antenna, *Southland Industries, Inc.*, 17 T. C. 1551, and a change in business contracts, *Packer Publishing Co.*, 17 T. C. 882, to name a few, were changes in the operation of a business and within section 722 (b) (4).

When we see the accelerated production, the reduced labor force, and the improved product, we must conclude that a change in the operation of the business has occurred. We find that such a change— the installation of the photo-mechanical equipment—is within the contemplation of section 722 (b) (4).

As an adjunct to the new photo-mechanical equipment petitioner also replaced four old offset presses with three new presses. This replacement is not a change in the operation of the business but rather an ordinary, usual and routine improvement which can not form the basis for relief. See *Suburban Transportation System*, 14 T. C. 823, 833. The new presses performed the same service as the old ones. While there is evidence that each individual new press had a greater capacity than the old ones, it appears that the aggregate production of the three new presses equaled the production of the old presses. The petitioner has not shown an increase in production based upon the installation of the new presses. Therefore, this installation of new presses does not qualify as a change in the character of the business.

Recognizing that the new photo-mechanical equipment was a change in the character of the business, we must next determine whether this change was reflected by an increase in petitioner's earning capacity so as to render its average base period net income an inadequate standard of normal earnings for the entire base period. Section 722 (b) (4). An increase in earning capacity may result not only from increased sales or production, but also from a decrease in operating expenses.

This is the situation we have before us. On December 31, 1938, in the time immediately prior to the installation of the new equipment, the petitioner had 20 employees in the plate-making department. On December 31, 1941, about the time the operation was running smoothly, petitioner's labor force was reduced to 12 employees in this department. Still later there were only 7 people in this same department. The facts show that the photo-mechanical equipment made it possible for petitioner to reduce its labor force in the plate-making department.

The next logical step is to question whether this reduced labor force decreased the direct labor expenses. Using the manual process, the direct labor expenses in the plate-making department for the 12

months preceding December 31, 1938, were approximately $33,000. The direct labor expense for a complete crew in this department when the photo-mechanical equipment was operating was approximately $20,000. The quantity of production was the same for both operations. However, under the mechanical method less time was required, and a better label was produced. We think that it is proper to conclude that this savings in labor costs under normal conditions would result in a reduction of operating expenses and an increase in earning capacity, after allowing for reasonable depreciation of the new equipment. Petitioner's average base period net income was an inadequate standard of normal earnings for the base period.

The new equipment was ready for operation on or about March 1, 1939. Uncontroverted expert testimony was introduced which was evidence of the fact that, generally, normal production would have been attained 3 months after the installation of the photo-mechanical equipment. However, the transition from the old to the new method took much longer than 3 months. Petitioner contends that the extended transition time was the result of labor difficulties. Respondent contends that the delay was caused by inefficient management. The evidence indicates that the old employees were fearful that the new equipment would eliminate their jobs. The employees' fears resulted in a work slow-down. Nevertheless, they were not discharged for their lack of cooperation since petitioner required their services, skill, and experience to maintain production with the old method when production under the new method failed. During this transition period the quality of petitioner's production deteriorated with a resulting decrease in sales. Considering the extended transition time and the decreased sales, we find that petitioner did not reach by the end of the base period the earning level which would have been reached if petitioner had made the change 2 years earlier. We believe that the labor problems would have been the same even under the push-back rule. Thus, the benefits of the push-back rule are available to the petitioner.

On the entire record we hold that petitioner has established that there was a change in the operation of the business, that the change resulted in an increased earning capacity, that the tax computed without the benefit of section 722 resulted in an excessive and discriminatory tax, and that its average base period net income is an inadequate standard of normal earnings. To further qualify for relief petitioner must show what is a fair and just amount representing normal earnings to be used as the constructive average base period net income.

The respondent agrees that the petitioner is entitled to the flood loss adjustment for the year ended June 30, 1937, and to the capital loss adjustment for the year ended June 30, 1938. The petitioner claims in addition that it is entitled to treat the architect's fee as an abnormal

deduction, but the Commissioner disagrees. Issues relating to abnormal deductions arise under section 711 (b) (1) rather than under section 722, but if the question of the architect's fee is properly before the Court at this time, nevertheless, the petitioner must lose because it has failed to sustain its burden of proof. Its argument and showing is merely that it did not continue with the building plans and that is not sufficient.

Because the petitioner's last base period year ended 6 months subsequent to December 31, 1939, it is necessary to reconstruct its income for the 6 months ended June 30, 1940.

From the record of petitioner's earnings, we conclude that its earnings for the last half of its fiscal year ended June 30, 1940, will be nearly equal to those for the first half of the year. Cf. *East Texas Motor Freight Lines*, 7 T. C. 579, 596.

Petitioner has introduced sufficient evidence to establish a fair and just amount representing normal earnings to be used as a constructive average base period net income. It is proper for us to reconstruct what is a reasonable amount of relief if this can be done from the record. *Jefferson Amusement Co.*, 18 T. C. 44; *Victory Glass, Inc.*, 17 T. C. 381, 388. We have determined the constructive average base period net income to be $30,422.

Since we have decided that petitioner is entitled to a constructive average base period net income, we must decide whether petitioner is entitled to an unused excess profits credit carry-over from the years ended June 30, 1941 and 1942.

No carry-over to the years in controversy [3] may be obtained for the year ended June 30, 1941, since 2 years is the limit of the carry-over. Section 710 (c). Further, no carry-over for the year ended June 30, 1941, may be carried over to the year ended June 30, 1943, because petitioner has failed to make a formal claim as prescribed in the regulations. See section 35.722–5, Regulations 112; *Lockhart Creamery*, 17 T. C. 1123.

However, when we come to the carry-over for the year ended June 30, 1942, more favorable treatment is required if a carry-over for that year turns out to be warranted under the Rule 50 recomputation. For the year ended June 30, 1944, petitioner made a proper and timely application for relief under section 722. Included in this application (Form 991) petitioner submitted a "Redetermination of Unused Excess Profits Credit Carry-over," and based on its own reconstruction of average base period net income, it computed an unused excess profits credit adjustment from the year 1942. Contrary to the respondent's contention, there was a proper claim for the benefits of a credit arising

---

[3] Fiscal years ended June 30, 1944, 1945, and 1946.

from the use of a constructive average base period net income for the year ended June 30, 1942. See *Packer-Publishing Co., supra*, p. 898.

Respondent has urged on brief that the "variable credit rule" [4] be used in computing a constructive average base period net income for the years ended June 30, 1941 and 1942.

We quote from the Bulletin on Section 722 of the Code, p. 120, as to the respondent's explanation for the need of the rule:

* * * If the business which has been commenced or changed has reached its full level of normal operations during the excess profits tax taxable years, the standard so obtained is a fair measure of normal profits. However, there are instances in which the business may not have reached its full level of normal operations during the excess profits tax taxable years. In such situations it would obviously be unfair to allow the use of a "yardstick", based on full level of normal operations, for the measurement of earnings based on operations which have not reached that level. The regulations provide in such cases for the determination of a fair and just amount representing normal earnings which amount may vary in different excess profits tax taxable years. * * *

The Bulletin refers to section 35.722–3 (d) of Regulations 112 for the authority for this rule. This section is in part as follows:

Since the amount of normal earnings in the case of a taxpayer which is considered to have commenced business or changed the character of its business two years prior to the actual event is based upon a reconstructed business experience which has been lengthened two years, such amount may exceed the actual earnings realized by the taxpayer during its first or second excess profits tax taxable year. Consequently, the reconstruction normal earnings which would be used as the constructive average base period net income after the second excess profits tax taxable year may not constitute a fair and just amount to be used for the purposes of the excess profits tax for the first or second excess profits tax taxable year. Therefore, in determining the constructive average base period net income to be used in computing the excess profits tax or the unused excess profits credit for the first or second excess profits tax taxable year, the fair and just amount representing normal earnings should be based upon the actual earning capacity which, as of the end of its base period, the taxpayer could reasonably have been expected to reach under normal conditions during such first or second excess profits tax taxable year. * * *

In other words, the variable credit "rule," as stated above, may be considered when the last year of the base period reflects substantially less than a full level of normal operation, and after the application of the 2-year push-back rule the question arises whether earnings had reached a normal level during the first and second excess profits tax taxable years. The rule provides that earnings during these 2 years of growth should not be reduced by an excess profits credit based upon a normal earning capacity. Failure to apply the variable credit

---

[4] We have been unable to find any reference to this rule in the Internal Revenue Code. The rule is discussed at length in the "Bulletin on Section 722 of the Internal Revenue Code" 1944, pp. 120–125. Certain principles in regard to commitment were discussed in the Report of the Committee on Finance, United States Senate, Revenue Bill of 1942, at p. 202, and also Report of House Ways and Means Committee on Revenue Bill of 1942, at p. 146.

"rule" in a situation such as we have here would result in a double benefit to the petitioner, and such was not intended by section 722.

From the evidence we have found that the new process was working smoothly by the early part of 1942, therefore, development was still in process in 1940 and 1941, and the first part of 1942. The variable credit rule is intended to apply in such a situation. Petitioner is not entitled to an operating loss carry-over from 1941, but since we have determined, if the Rule 50 computation warrants it, the propriety of a carry-over from 1942, we must determine a constructive average base period net income to be used for the 1942 computations. We have found this constructive average base period net income for 1942 to be $22,840.

Petitioner has also claimed relief under section 722 (b) (1) and (b) (2). Its basis under section 722 (b) (1) is that the employees' resistance to the new method was tantamount to a sit-down strike and thus was an event "unusual and peculiar" in its experience. Petitioner also alleges that the resulting loss in sales was a "temporary economic" event within the scope of section 722 (b) (2). Petitioner seeks relief under these two subsections only in the event relief under section 722 (b) (4) is denied. Since we have found a constructive average base period net income under section 722 (b) (4) for normal operating conditions, we do not need to discuss petitioner's other allegations.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*