BOONTON MOLDING COMPANY, PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket No. 28076.    Filed September 26, 1955.

*Harold Wisan, Esq.*, for the petitioner.
*Maurice S. Bush, Esq.*, for the respondent.

1066

1074

**OPINION.**

Opper, *Judge:* Petitioner seeks relief from excess profits taxes under section 722 (b) (2) and (4) of the Internal Revenue Code of 1939.

## I.

Its position under section 722 (b) (2)[1] is that its actual base period net income is an inadequate standard of normal earnings because its business was depressed during that period by reason of the merger of Anchor, its contractual sole outlet for caps, with Hocking Glass Company, and the changes in policies incident to the merger. Most drastic of these, according to petitioner, were the changes in crucial sales and other personnel and the decline of interest in petitioner's plastic closures.

---

[1] SEC. 722.  GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

* * * * * * *

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry, * * *

The facts disclose that, compared with the rest of the industry, petitioner lost substantial ground during the last 3 years of its base period on the sales of its bottle closures. Our findings show petitioner's declining percentages of total caps sold by the entire industry.

From the end of 1934 through 1938 petitioner was in a continuing decline with respect to its net sales of caps and in a substantially similar decline from the end of 1936 through 1939 as to its percentage of caps sold as compared to the caps sold by the entire industry. We know that 1938 was a year of general business recession, and that petitioner's plastic caps for the whiskey trade were to some extent luxury items in that a cheaper metal cap might be satisfactorily used in their stead. We also know that there was considerable competition in this field. Nonetheless we think the figures demonstrate and the evidence discloses that something additional to the general recession and competition happened to petitioner's plastic closure business in 1937, 1938, and 1939. The Anchor-Hocking merger, the effect of which was apparent at that time, was not accomplished until December 1937. But we are satisfied that earlier in that year petitioner's business suffered by reason of the influence of the Hocking interests preparatory to the merger. This developed in 1937 into unfavorable changes of personnel, including the vice president who had devoted his full time to supervising the plastic closures portion of the business. Despite respondent's contentions to the contrary, this depression from the loss of customers was just as much a "temporary economic circumstances, unusual in the case of this taxpayer" as were the situations in *Ainsworth Manufacturing Corporation*, 23 T. C. 372, and *Southern California Edison Co.*, 19 T. C. 935. In the former we said:

The bulletin prepared by the Bureau of Internal Revenue on section 722 at page 16, part III, states: "The term 'economic' includes any event or circumstance * * * externally caused with respect to a particular taxpayer, which has repercussions on the * * * volume of sales of * * * an individual taxpayer * * *"

In the latter we said:

Indeed, section 35.722–3 (b) of Regulations 112, after discussing the meaning of the word "temporary," provides an example which goes far to sustain petitioner's position:

"An example * * * might be a taxpayer which for a long period of years conducted business with one customer which it lost during the base period because such customer decided to manufacture for itself the product it had formerly bought from the taxpayer. The taxpayer would be compelled to develop a new market. The average earnings of the taxpayer for the period of time during which the taxpayer was engaged in obtaining new customers would not represent an adequate standard of its normal earnings and would be sufficient cause for the establishment of a constructive average base period net income under section 722."

Nor are we any more constrained here than in *Ainsworth* to deny petitioner relief merely because its long range average net income from 1922 through 1939 is shown by the stipulation to be less than its actual average base period net income. Petitioner was in a new and growing business.

To adjust for the depression which we conclude existed in petitioner's base period, reference to petitioner's industry position in 1936—its first base period year—is not without significance. In that year petitioner was not affected by the Anchor-Hocking contemplated merger. It seems to us that it then had about as much of the industry's total business as it was going to obtain in this competitive field. But to allow for additional pressures of increasingly strong competition which appear to have been present and growing,[2] we conclude that without the depressing factors resulting from the Anchor-Hocking merger petitioner may be regarded as producing 20 per cent of the entire industry's plastic closure caps in the remaining 3 years of its base period.

Such an adjustment would increase petitioner's actual average base period net income.

Petitioner is also claiming relief by reason of section 722 (b) (4) changes in the character of its business, when during the base period petitioner introduced injection molding, invented and commenced using the Sayre automatic molding machine, and effected changes from sales of its products through a single jobber to sales by a commission sales agency.

Our findings of fact make it abundantly clear that these changes satisfy the so-called qualifying factor of the statutory provision. See *Lamar Creamery Co.*, 8 T. C. 928; *Fishbeck Awning Co.*, 19 T. C. 773. Indeed, respondent does not strongly contend otherwise.

## II.

Petitioner's long-established process of manufacturing its plastic products was by compression molding, and it was not until 1938 that its work with injection molding justified its commercial introduction. At that time suitable materials and machines were available to make injection molding commercially feasible although improvements in material continued after the base period. The two processes are substantially different in method and in the type of product which can be made. The articles that can be made by one process are not efficiently made with the other. Except incidentally, injection molding does not compete with compression molding.

---

[2] For example in 1939, when there was an increase in sales of about 8 million over 1938, petitioner showed a decline from 17.41 per cent to 15.23 per cent in percentage of industry sales.

Petitioner's president, who was a pioneer in the entire field of manufacturing and introducing plastics, testified that had petitioner introduced its injection products 2 years before it did so, by December 31, 1939, it would have been selling more than $250,000 of such product. Articles manufactured by injection plastic were not new inventions but amounted to a use of the plastic medium for established products. Such a presentation had novelty of color, texture, and design.

Our conclusion must be that substantial demand did exist during the entire base period, that more demand could have been developed, as respondent virtually concedes, had products been available, and that had petitioner commenced this process 2 years before it did so, by December 31, 1939, its gross sales from it would have been $60,000, which was scarcely one-fourth of its then capacity.

The facts also show that petitioner's gross profit on its injection molded products was 40 per cent on sales compared to an over-all comparable profit of 25 per cent. Had petitioner made this change 2 years before it did so, it would have increased its actual average base period net income.

### III.

And the Sayre machine must, as we have said, be regarded as the type of change envisaged by section 722 (b) (4). It was an extensive change to a machine which was of a new type and fully automatic. Its prime accomplishment was that it effected considerable cost saving in the manufacturing process. See *Brown Paper Mill Co.*, 23 T. C. 47; *Morgan Construction Co.*, 23 T. C. 242; *Nielsen Lithographing Co.*, 19 T. C. 605. Although somewhat similar cost saving had been accomplished by use of the Lauterbach machine by petitioner's competitors, nonetheless petitioner had sold in that market at a profit and the cost saving was quite real to it and capable of ready translation into additional income. Petitioner limits its claim on the Sayre machine to the production of caps. Had petitioner had the Sayre machine available 2 years earlier than it did in December 1939, we are convinced that by December 31, 1939, petitioner would have been producing substantially its entire cap production of 104,368,000 (as reconstructed under section 722 (b) (2)) [3] by the use of the Sayre machines. To make a proper adjustment for this throughout the base period years, we regard it as reasonable to use petitioner's 1936 actual and its section 722 (b) (2) reconstructed production figures for the other years. The two Sayre machines installed and in operation on December 31, 1939, would have been capable of this production. We have found that there was a cost saving of 63.66 cents per thousand on 28-millimeter caps by use of the Sayre machine. A large part of

[3] We are in agreement with the Bulletin on Section 722 which provides on page 143 for such multiple basis for section 722 relief.

the cap production was not 28-millimeter caps, and as to these the saving would not be so large. However, we are convinced that it would be something. On the other hand, estimates of the amount of saving seem to us unduly optimistic and we conclude that savings would have been effected but in a smaller amount than has been claimed, which should be an addition to petitioner's actual base period net income.

## IV.

Finally, there is the matter of petitioner's initiation of a new sales method. As we have stated petitioner's change from its contractual sole jobber outlet through Anchor to direct selling by the use of salesmen on a commission basis satisfies the initial qualifying requirements of section 722 (b). (4). See *Midwest Liquor Dealers, Inc.*, 20 T. C. 950; *Wisconsin Farmer Co.*, 14 T. C. 1021. Such a program was embarked upon during the base period. The findings of fact demonstrate that this was a substantial change and that substantial savings resulted from it.

Our problem is to ascertain under the 2-year push-back rule what earning level petitioner would have reached by December 1939 had it made this change 2 years before it did so.

There is ample indication that the new commission sales outlet was an extremely able one and that it possibly could have produced orders for 28-millimeter caps alone to exceed the number of caps petitioner had produced in any one year. The plan was that petitioner's initial activities in this field would be directed to whiskey manufacturers' consumption of 28-millimeter caps, which in 1939 amounted to 200 million caps. But, it was not contemplated that petitioner would do a 28-millimeter business to the exclusion of all other activity. It was endeavoring to obtain the very large consumers as its customers. Another facet in the development of the new sales program is that petitioner continued to make all size caps, except 28 millimeter, for Anchor after the cancellation of the contract. These sales to Anchor continued for 2 years, presumably while Anchor was equipping itself for production. A substantial argument could be made on the foregoing to justify reconstructed increased production and sales during the base period, but petitioner has claimed no more than a reconstruction based upon actual base period sales. At least the prospect for the 28-millimeter cap business had a strong foundation.

Respondent's view that had petitioner been selling through salesmen in the push-back period, because of the competitive conditions, it would not have sold at the same dollar figure at which Anchor sold is one of those conjectures so prevalent in this type of case. In the present circumstances, it must be resolved substantially in petitioner's favor. Petitioner had long been selling at established market price,

and the quality and novel features of its caps would tend to establish that it would not be forced into crippling price concessions.

Upon a consideration of all the factors, we are of the opinion that had petitioner commenced this method of selling 2 years before it did so, it would have effected saving and hence increased the constructive average income for the base period years.

## V.

The stipulated adjustment under section 722 (b) (4) for the change in the ratio of borrowed capital to total capital works a further increase in petitioner's constructive average base period net income of $1,000. Such an adjustment is indicated factually, and respondent's argument that alone it would not be "substantial" as required by the statute fades by reason of the other items allowed. See *Rand Beverage Co.*, 18 T. C. 275.

As indicated in our ultimate findings the foregoing calls for an increase of $76,000 in petitioner's constructive average base period net income.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*