148

AGRICULTURAL BROADCASTING COMPANY, PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 35583.    Filed May 5, 1960.

*John Enrietto, Esq.,* and *James P. Jones, Esq.,* for the petitioner.
*Julian L. Berman, Esq.,* for the respondent.

#### OPINION.

ARUNDELL, *Judge:* Respondent denied petitioner's applications
for relief from excess profits taxes under section 722 of the Internal
Revenue Code of 1939, its claims for refund contained in such appli-
cations, and its related claims for refund (Form 843) filed by
petitioner for the taxable years 1940 through 1945.

Petitioner seeks relief primarily under section 722(b)(4), the
material portions of which are in the margin.[1]

The evidence in this case was presented before a commissioner
of this Court, and the report of his findings of fact was served on
the parties on December 17, 1959. Petitioner took no exceptions to
the commissioner's findings as such. Respondent's objections dealt
principally with requested additions to the facts as found. Both
parties requested certain additional findings particularly with re-
spect to reconstructions and ultimate conclusions. The additional
findings requested by the parties, including ultimate conclusions,
will be hereinafter set forth to the extent granted.

---

[1] SEC. 722(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed
under this subchapter (without the benefit of this section) shall be considered to be
excessive and discriminatory in the case of a taxpayer entitled to use the excess profits
credit based on income pursuant to section 713, if its average base period net income
is an inadequate standard of normal earnings because—

\*          \*          \*          \*          \*          \*          \*

(4) the taxpayer \* \* \* during \* \* \* the base period \* \* \* changed the character
of the business and the average base period net income does not reflect the normal
operation for the entire base period of the business. If the business of the taxpayer
did not reach, by the end of the base period, the earning level which it would have
reached if the taxpayer had \* \* \* made the change in the character of the business
two years before it did so, it shall be deemed to have \* \* \* made the change at such
earlier time. For the purposes of this subparagraph, the term "change in the char-
acter of the business" includes a change in the operation or management of the
business, a difference in the products or services furnished, a difference in the ca-
pacity for production or operation \* \* \*

The Court adopts the commissioner's report as its findings of fact, subject to any additional findings to be hereinafter set forth. For the purposes of this opinion, the pertinent facts will be summarized only to the extent deemed necessary for a proper disposition of this case.

Petitioner, an Illinois corporation with its principal office in Chicago, was organized on or about October 23, 1928, as a subsidiary of Prairie Farmer Publishing Company, Chicago, Illinois. On or about November 11, 1928, Prairie Farmer Publishing Company assigned radio station WLS to petitioner and thereafter at all times material hereto petitioner operated WLS.

Since 1841 Prairie Farmer Publishing Company has published a farm magazine called the Prairie Farmer. The Prairie Farmer was known as the oldest farm magazine in the United States and has always promoted the betterment of farm conditions. The magazine was circulated in Illinois, Indiana, southern Wisconsin, and southwestern Michigan.

After October 1928 WLS referred to itself as "The Voice of Agriculture" and as the "Prairie Farmer Station." It consistently devoted a substantial amount of broadcast time to service programs of a purely agricultural nature.

The agricultural service programs and the entertainment carried by WLS during the base period years appealed to rural and small-town audiences. The character and quality of a radio station's programs have a pronounced influence on its sales. Because WLS programs attracted farm audiences many of its advertisers were manufacturers or distributors of products or services used primarily by farmers.

From about March 6, 1931, to November 12, 1938, station WLS operated as a part-time 50 kilowatt (kw.) clear channel station from transmitting facilities at Downers Grove, Illinois. The other part-time 50 kw. clear channel station using this transmitter was station WENR. Arrangements for the use of such facilities were made by contract between petitioner and the National Broadcasting Company, Inc. (NBC), a national network system. The contract allocated broadcasting time over the transmitter facilities between WLS and WENR and provided for payments with respect to the use thereof. Under this contract, and its subsequent modifications, WLS was primarily a daytime (prior to 6 p.m.) broadcasting station.

In 1937 petitioner became dissatisfied with the performance of the Downers Grove transmitter and asked NBC to make some improvements in its facilities. At that time the Downers Grove

transmitter had marked directional characteristics and operated below the minimum efficiency established by the Federal Communications Commission (FCC) for transmitters of this class. When NBC refused, petitioner decided to build its own 50 kw. transmitter at Tinley Park, Illinois.

Work on the Tinley Park transmitter started in July or August 1938. The transmitter was completed and in use on November 12, 1938. The total cost of land, buildings, and equipment was $229,-870.30. Prior to completion thereof and under date of September 15, 1938, NBC acquired an undivided one-half interest in the Tinley Park property by agreeing to pay one-half of the total cost and to share equally the expenses of operating the new transmitter.

Under date of September 15, 1938, petitioner and NBC entered into two other contracts. One was a time-sharing agreement which fixed the hours of operation by WLS and WENR. The other was an affiliation agreement under which WLS would broadcast NBC network programs. WLS derived various advantages thereunder over its previous contracts with NBC.

On November 12, 1938, the Tinley Park transmitter was the most modern 50 kw. transmitter available. It was a much more efficient facility than the Downers Grove transmitter. It had no directional characteristics, as its signal strength was nearly the same in all directions. At a distance of 1 mile its nondirectional signal strength exceeded the original minimum standards set up by FCC and also a later minimum standard set up by FCC. The Tinley Park transmitter materially increased the primary and secondary coverage of WLS both as to square miles and as to population served.

During the base period the coverage secured by a radio station was one of the most important factors in selling time to an advertiser. Whenever a station materially increased its coverage, its economic utility to advertisers usually increased. Other important factors in selling to advertisers were the quality of the program, the time available, and the rates. The advertisers on WLS were mainly regional or national businesses who were interested in contacting large numbers of people throughout broad areas. By changing its transmitting facilities so as to increase the number of areas and people provided with primary and secondary service, WLS increased its attractiveness and economic utility to advertisers.

During the years 1936 through 1940 the monthly volume of non-network radio advertising at WLS was better during the 8 months, October through May, than it was during the 4 months, June through September. This was a typical pattern in the radio indus-

try. This seasonal pattern of radio advertising placed 5 of the 8 larger-volume months in the first half of the calendar year. As a result, non-network-time sales of WLS were usually larger in the first half of the calendar year than in the last half, as shown by the following table for the calendar years 1936 through 1940:

| Year | January to June | July to December | Ratio, first half to last half |
| --- | --- | --- | --- |
| | | | Per cent |
| 1936 | $253, 655. 97 | $216,092. 04 | 117. 38 |
| 1937 | 258, 741. 78 | 234, 952. 67 | 110. 13 |
| 1938 | 303, 748. 19 | 235, 226. 74 | 129. 13 |
| 1939 | 313, 719. 82 | 323, 385. 37 | 97. 01 |
| 1940 | 391, 482. 55 | 351, 095. 49 | 111. 50 |

As much as 75 per cent of all nonnetwork-time sales for the months of October through May were contracted for prior to October 1. The standard contracts ran for a period of 13, 26, 39, or 52 weeks with broadcasting to start on or about October 1. Advertisers who contracted for nonnetwork time committed themselves, to a major extent, during June, July, and August for the forthcoming broadcasting year.

From July 1934 through February 1936 WLS handled its own national advertising and had no station representative. During this period it had a branch office in New York City which handled national advertising originating in New York City and vicinity. From March 1, 1936, through December 31, 1937, John Blair & Company was the station representative of WLS in selling nonnetwork time to national and regional advertisers. During the calendar year 1938, International Radio Sales Company was station representative for WLS in selling nonnetwork time. During the calendar year 1939, John Blair & Company again became station representative for WLS. Both Blair and International were paid on a commission basis.

During 1938 and 1939 petitioner paid total commissions in selling and promotional expenses of $13,863.27 and $22,011.03, respectively. Included in the amount of $13,863.27 were $8,224.04 paid to John Blair & Company and $2,922.44 paid to International Radio Sales Co. Included in the amount of $22,011.03 were $20,070.49 paid to Blair and $1,643.67 paid to International.

Petitioner's excess profits net income (in dollars) for each of the base period years before deduction for income taxes under section 711(b)(1)(A), 1939 Code, is made up of revenue and expenses as follows:

| | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|
| A. Revenue from sale of station time: | | | | |
| To networks | $126,080 | $133,957 | $132,030 | $125,018 |
| To nonnetwork customers | 469,461 | 493,694 | 538,842 | 637,406 |
| Total sales of station time | 595,541 | 627,651 | 670,872 | 762,424 |
| Less: | | | | |
| Agency commissions netted in revenue from nonnetwork customers commissions to representatives | 5,897 | 11,594 | 13,863 | 22,011 |
| Amount retained from sale of station time | 589,644 | 616,057 | 657,009 | 740,413 |
| B. Incidental broadcast revenues: | | | | |
| Talent sales | 138,122 | 159,583 | 116,509 | 84,044 |
| Total broadcast revenue | 727,766 | 775,640 | 773,518 | 824,457 |
| Operating costs and expenses: | | | | |
| Transmitter expenses | 66,791 | 67,522 | 52,665 | 36,515 |
| Depreciation | 8,342 | 9,528 | 8,063 | 13,395 |
| Amortization-leasehold improvements | 3,989 | 2,991 | | 5,303 |
| Talent costs | 183,105 | 204,890 | 211,614 | 199,827 |
| Program and continuity costs | 108,307 | 125,992 | 115,636 | 123,895 |
| Studio expenses | 37,593 | 39,432 | 41,179 | 49,601 |
| Selling expenses | 48,252 | 62,160 | 56,562 | 68,296 |
| General and administrative expense | 108,903 | 119,432 | 127,266 | 122,301 |
| Discounts allowed | 8,936 | 9,359 | 7,101 | 9,106 |
| Total operating costs and expenses | 574,218 | 641,306 | 620,086 | 628,239 |
| Net profit from operations | 153,548 | 134,334 | 153,432 | 196,218 |
| Other income—excluding dividends | 9,164 | 6,584 | 2,372 | 3,617 |
| Other—deductions—excluding long-term capital loss | (293) | (42) | (1,912) | (408) |
| Net profit from operations—plus other income less other deductions | 162,419 | 140,876 | 152,892 | 199,427 |
| Miscellaneous net adjustments: | | | | |
| Interest on U.S. obligations—in other income | | | (333) | (400) |
| Excess profits net income | 162,419 | 140,876 | 153,559 | 199,027 |

Entertainment talent was an important factor in sales of time by petitioner. It maintained a staff of entertainment talent on its payroll which was available to advertisers for use on their programs. Petitioner tried to sell this talent to its advertisers in order to recapture the overhead expense represented thereby. Practically all the talent sold by petitioner was from its own staff of entertainers but, where an advertiser wanted a different type of show, petitioner would hire elsewhere the talent necessary for such a show and charge it to the advertiser, or the latter would provide his own talent. Where an advertiser bought time but objected to paying anything more for entertainment, petitioner might provide certain talent free of charge. On the other hand, where petitioner had an outstanding act, an advertiser would pay well to have the act on his program. Where entertainment talent was used for spot announcements, which brought in more money than if the talent were sold as a program, the advertiser was charged for the announcement only and not for the talent.

Petitioner's talent costs remained fairly constant during the 6-year period 1935 through 1940, averaging about $198,000 a year. However, its talent sales fluctuated during this period as sales increased each year during the first 3 years, with a yearly average of about $140,000, and declined each year during the last 3 years with a yearly average of about $92,000. For the 6-year period, petitioner's talent sales averaged about $116,000 a year. Neither talent sales nor talent

costs were affected by the change from the Downers Grove to the Tinley Park transmitter. The decline in talent sales from the peak year 1937 was due to a number of factors including concessions to advertisers, increased spot announcements (usually an announcement of 1 minute or less), more talent buying than usual in 1937, and reduced talent buying for one reason or another after 1937.

A comparison of petitioner's nonnetwork sales for 1937 and 1939 shows the following trend with respect to revenue derived from programs of 15 minutes or more, and from programs of less than 15 minutes, which consisted largely of spot announcements (cents omitted):

| Nonnetwork programs—15 minutes or more | | | |
|---|---|---|---|
| Year | Number | Revenue | Time |
| | | | (Hr:Min) |
| 1937: | | | |
| Daytime | 2107 | $189,261 | 605:30 |
| Evening | 416 | 121,719 | 234:15 |
| Total | 2523 | 310,980 | 839:45 |
| 1939: | | | |
| Daytime | 1748 | 192,411 | 535:15 |
| Evening | 502 | 167,450 | 293:00 |
| Total | 2250 | 359,861 | 828:15 |

| Nonnetwork programs—less than 15 minutes | | | |
|---|---|---|---|
| 1937: | | | |
| Daytime | 4536 | 180,583 | 100:57 |
| Evening | 50 | 2,125 | 50 |
| Total | 4586 | 182,708 | 101:47 |
| 1939: | | | |
| Daytime | 5451 | 221,100 | 91:39 |
| Evening | 1381 | 55,475 | 14:21 |
| Total | 6832 | 276,575 | 106:00 |

During 1935 and until December 15, 1936, petitioner's maximum hourly rates for daytime and evening broadcasts were: $600, evening, and $300, daytime. For the remainder of the base period and during 1940 the maximum hourly rates were: $750, evening, and $450, daytime.

During the base period years, the estimated total annual volume of national advertising and of local advertising, in all media, and the estimated total annual volume of national advertising and of local advertising, in radio, were as follows (in millions):

| | Estimated annual volume | | | |
|---|---|---|---|---|
| Year | All media | | Radio | |
| | National | Local | National | Local |
| 1936 | $1,003.2 | $899.2 | $108.1 | $24.0 |
| 1937 | 1,102.5 | 969.2 | 129.4 | 48.1 |
| 1938 | 1,030.6 | 873.4 | 136.6 | 43.9 |
| 1939 | 1,085.8 | 894.6 | 149.1 | 50.2 |

During the base period, radio broadcasting companies filed corporate returns with total compiled receipts and total compiled net profit or loss as reported, less tax-exempt income plus interest paid, as follows (in thousands):

| Year | Number of returns | Total receipts | Total profits |
|---|---|---|---|
| 1936 | 477 | $118,116 | $16,160 |
| 1937 | 467 | 124,754 | 17,846 |
| 1938 | 526 | 123,511 | 14,041 |
| 1939 | 556 | 137,941 | 18,634 |

Petitioner's excess profits net income for each of the taxable years 1940 through 1945 was as follows:

| Year | Income method (Sec. 711(a)(1)) | Year | Income method (Sec. 711(a)(1)) |
|---|---|---|---|
| 1940 | ¹ $174,383.53 | 1943 | $262,048.05 |
| 1941 | 230,931.08 | 1944 | 331,231.81 |
| 1942 | 240,048.29 | 1945 | 192,863.35 |

¹ This figure is after deducting $52,486.82 for income taxes.

Petitioner's average base period net income computed pursuant to the provisions of section 713(f), sometimes referred to as the "growth formula," was $155,975.52 for the taxable year 1940 and $188,615.78 for the taxable years 1941 through 1945.

For each of the taxable years 1940 through 1945, petitioner's excess profits tax liability, as finally determined by respondent, without the application of section 722, was as follows:

| Year | Liability | Year | Liability |
|---|---|---|---|
| 1940 | $5,362.04 | 1943 | $70,076.75 |
| 1941 | 17,698.44 | 1944 | 121,450.03 |
| 1942 | 50,276.97 | 1945 | 3,145.00 |

Petitioner contends that it changed the character of its business in November 1938 when it moved from the Downers Grove transmitting facilities to its newly constructed Tinley Park transmitting facilities; that the new facilities increased the strength of its radio station signal and materially expanded the territory and population covered by such signal; that a substantial increase in its non-network-time sales resulted from this change which was not fully reflected in income by the end of the base period; and that a reconstruction of its base period earnings, based upon its increased sales in the last half of 1939 and the 2-year push-back rule, demonstrates that $269,835.91 is a fair and just amount to be used as a constructive average base period net income in lieu of the average base period net income determined under section 713 of the 1939 Code. Petitioner cites *Southland Industries, Inc.*, 17 T.C. 1551, as supporting its contentions as to qualification.

Respondent contends that the change in character claimed by petitioner is not such a qualifying change as provided for in the statute, and that in any event the record does not support a reconstruction which will afford petitioner any relief.

We agree with petitioner that *Southland Industries, Inc., supra,* supports petitioner's contentions as to qualification. Respondent in his reply brief concedes that the *Southland* case applies in every particular except that the new facilities resulted in no rate increase. It is true that there was no rate increase as such in the instant case but, under the contracts of September 15, 1938, petitioner acquired additional benefits from which it realized increased earnings. Among such benefits it acquired additional broadcasting time and it eliminated the rental payments of $67,170 per year. Also, among such benefits it increased its daytime and evening "spot announcements" (usually an announcement of 1 minute or less) from which considerable additional income was derived. For example, in 1937 nonnetwork daytime programs of less than 15 minutes, totaling 100 hours and 57 minutes for the entire calendar year 1937, produced revenue of $180,583 which is at an hourly rate of $1,788 per hour, whereas in 1939 similar programs totaling 91 hours and 39 minutes for the entire calendar year 1939 produced revenue of $221,100, which is at an hourly rate of $2,412 per hour. Similarly, evening programs produced a much larger increase. For the entire calendar year 1937, petitioner had only 50 minutes of evening programs which produced revenue of $2,125 or at an hourly rate of $2,550, whereas in 1939 similar programs totaling 14 hours and 21 minutes for the entire calendar year 1939 produced revenue of $55,475, or at an hourly rate of $3,865.

We think this increase in income from spot announcements and the other benefits mentioned above can well be attributed to the new transmitter at Tinley Park which materially increased coverage in area and population, provided a stronger station signal, and eliminated directional characteristics.

We hold that petitioner has established the necessary qualification entitling it to a reconstruction of its average base period net income.

The computation of the constructive average base period net income (CABPNI) submitted by petitioner of $269,835.91 is based primarily on a reconstruction of the sale of station time to nonnetwork customers for the calendar year 1939.[2] It then backcasts these 1939 reconstructed sales to the other 3 years in the base period

---

[2] In reconstructing the sale of station time to nonnetwork customers for the calendar year 1939, petitioner used the actual sales for the last 6 months of 1939 of $323,385.37. It then assumed that its non-network-time sales for the first half of 1939 would have exceeded those for the last half of 1939 by at least as much as its non-network-time sales for the first halves of 1936 and 1937 exceeded those for the last halves of said years, and thus arrived at a total reconstructed non-network-time sales for the full calendar year 1939 of $691,268.57.

by means of an index based upon the estimated annual volume of national advertising for all media in order to arrive at the reconstructed average sales of station time to nonnetwork customers for the base period. It adds to such reconstructed average the actual average of station time sales to networks, talent sales, and other minor income items. From this total it deducts the average operating costs and expenses, some in actual amounts and others in reconstructed amounts. This type of reconstruction has been used by this Court in other cases. See *Lamar Creamery Co.*, 8 T.C. 928; *Southland Industries, Inc., supra.*

We do not agree with the index used by petitioner in its reconstruction. As stated above, this index was based upon the estimated annual volume of national advertising for all media. There are several indexes which can be computed from the facts in this case which are more representative of the radio industry. By using the index we think to be most appropriate and taking into account all the items of income and expenses, some of which we have adjusted in accordance with the facts of this case, and after a careful consideration of all the facts and conditions existing in the base period, it is our opinion and we so find as a fact that a fair and just amount representing normal earnings to be used as a CABPNI for the purpose of computing petitioner's excess profits credit is the amount of $215,000.

We, therefore, hold that petitioner's excess profits taxes for the taxable years 1940 to 1945, inclusive, computed without the benefit of section 722, I.R.C. 1939, as amended, are excessive and discriminatory and we so find.

Since petitioner reached the full development of the qualifying change during the last half of the calendar year 1939, there is no occasion for the application of the variable credit rule. *Nielsen Lithographing Co.*, 19 T.C. 605.

An adjustment for income taxes for the year 1940 will be made under Rule 50.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*