BERGSTROM PAPER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 32561. Filed September 21, 1956.

*George D. Spohn, Esq.,* and *Roy C. LaBudde, Esq.,* for the petitioner.
*David H. Nelson, Esq.,* for the respondent.

### OPINION.

MURDOCK, *Judge:* The Commissioner of Internal Revenue disallowed claims of the petitioner for excess profits tax relief under section 722 (b) (4) and (5) of the Internal Revenue Code of 1939 for the taxable years 1941, 1942, and 1943.

Section 722 (b) (4) provides that the excess profits tax without the benefit of section 722 shall be considered excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income, the average base period net income of which is an inadequate standard of normal earnings because the taxpayer, during the base period, changed the character of its business and the average base period net income does not reflect the normal operation for the entire base period of the business. It defines "change in the character of the business" to include a change in the operation of the business, a difference in the products or services furnished, and a difference in the

capacity for production or operation, and provides further that "any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939 as a result of a course of action to which the taxpayer was committed prior to January 1, 1940 * * * shall be deemed to be a change on December 31, 1939, in the character of the business."

The taxpayer claims that it qualifies for relief under those provisions. Specifically, it contends that the installation of a new filtration plant and its commitments to install new cone cookers, separately and together, resulted in a difference in its capacity for production or operation, and it also contends that the contract entered into on August 25, 1939, and the installations made by it within that same year to deliver the steam resulted in a difference in the products or services furnished within the meaning of section 722 (b) (4). The findings of fact of a commissioner of the Tax Court before whom the evidence was presented have been adopted by the Court as its findings of fact.

The petitioner is entitled to compute its excess profits tax credit under the income method or under the invested capital method, whichever produces the lesser tax. The respondent has allowed credits on the basis of invested capital in the amounts of $112,413.82 for 1941, $116,745.83 for 1942, and $118.669.33 for 1943. The arithmetical average base period net income of the petitioner was $79,879.51, but under the growth formula of section 713 (f) the average base period net income would be $83,825.62. The petitioner claims a constructive average base period net income of $142,668.59.

The petitioner was engaged in operating a mill for the manufacture of paper. The materials from which it made the paper included wood pulp and also wastepaper, principally high grade magazines. It preferred to use a large percentage of pulp obtained from wastepaper and a smaller percentage of virgin pulp because it could produce pulp from wastepaper cheaper than the cost of virgin pulp. The various steps used by the petitioner in the manufacture of paper required 3 million gallons a day of clear clean water during the base period. It had an abundant supply of water from nearby Lake Winnebago which it filtered in pits filled with sand and rock of various degrees of coarseness. Reservoirs held filtered water from which it drew during those times when the filter pits had to be cleaned. The impurities in the lake water increased during the base period, due partly to the growth during the summer months of algae, and the petitioner's method of filtration became unsatisfactory. Cleaning of the pits had to be done so frequently that the filtered water in the reservoirs sometimes became exhausted, causing a shutdown of the petitioner's plant. This situation was more acute during the summer months.

The machinery which the petitioner used during the base period

years to remove ink from the wastepaper while making it into pulp included 4 metal drum rotating cookers. The use of new types of ink had recently come into general use and those types of ink could not be removed satisfactorily by the process then in use. The cookers afforded no opportunity for inspection to determine how a particular batch was progressing, and improperly cooked batches would sometimes require the discarding of large quantities of finished paper. The petitioner had to increase the proportion of virgin pulp to pulp obtained from wastepaper in order to obtain the desired whiteness of its finished product, and even so the finished paper was not as white and as free of specks as it should have been. The petitioner was experimenting in an effort to solve the problems thus encountered in the filtration of the water and in the cooking process.

A decision was arrived at in the latter part of 1938 to build a new filtration plant and to replace its single-batch drum cookers with an entirely new and more efficient continuous process of cooking. A new water treatment plant was completed and put into operation in 1939 at a total cost of about $69,000. A chemical process was used in this plant called flocculation. It purified the water by means of a precipitate. This filtration plant was the first one installed in the area. It completely solved the water problem for the petitioner and by the end of 1939, supplied an abundant quantity of soft, clear water conducive to the manufacture of a better grade of paper than was theretofore being obtained with water from the old sand filter system.

Two of the principal officers of the petitioner finally developed a new cone-type cooker, an entirely new and novel piece of machinery which was not obtainable by purchase in the open market and the details of which the petitioner retained as a trade secret for a number of years. Six such cookers were installed in a series, and when so installed they solved the cooking and de-inking problem which had faced the petitioner. The 4 old drum cookers were then removed. The building and installation of the new cone cookers had been authorized by the board of directors in December 1938, and the petitioner ultimately spent $57,504.90 in this connection, most of which was contracted for prior to January 1, 1940. See *Crowell-Collier Publishing Co.*, 25 T. C. 1268. The change from the old batch method to a continuous cooking process in the de-inking process was a pioneer venture in the paper mill business. The change was practically completed by October 1941. The newly installed cone cookers were in full operation by the latter part of 1941. Better fiber was obtained, by the new cooking process, from wastepaper than had been obtained previously, and the petitioner was able to use a greater proportion of wastepaper pulp than of virgin pulp in manufacturing its finished book paper. The change in the capacity for production of the business represented by

the installation of the cone-type cookers consummated after December 31, 1939, was the result of a course of action to which the taxpayer was committed prior to January. 1, 1940.

The combination of the cone cookers and the improved supply of water enabled the petitioner to overcome the de-inking and dirty water difficulties encountered earlier, and enabled the petitioner to produce more efficiently and more economically wastepaper pulp which much more nearly approached the whiteness of virgin pulp. It increased materially the capacity of the plant to produce whiter and greater quantities of pulp fibers reclaimed from wastepaper, with the result that the cost of manufacturing the finished paper was lowered and the finished product was brighter and higher in quality.

The above changes were not ordinary, usual, or routine improvements in the conduct of a well-run business but, on the contrary, were important basic changes in that business, which directly resulted in a substantially higher level of normal earnings. Cf. *Boonton Molding Co.*, 24 T. C. 1065; *Morgan Construction Co.*, 23 T. C. 242; *Brown Paper Mill Co.*, 23 T. C. 47; *Nielsen Lithographing Co.*, 19 T. C. 605; *Schneider's Modern Bakery, Inc.*, 19 T. C. 763; Bulletin on Section 722, part V, subpart I (C); Regs. 112, sec. 35.722-3 (*d*). The petitioner's plant, prior to these changes, did not have as great a capacity to produce profitably satisfactory paper of the type demanded by the customers of the petitioner as it had after the changes and the capacity of the petitioner to produce a salable product profitably was increased by those changes.

The Kimberly-Clark Corporation owned and operated 3 paper mills located just across a canal from the property of the petitioner. It had an inadequate supply of steam for those mills and it was seeking, in the latter part of 1939, a source of supply of steam not only for its current operations but for an expansion program then in progress. The petitioner at that time and all during the base period years could produce sufficient steam not only for its own needs but for the needs of Kimberly-Clark. However, it did not know that Kimberly-Clark wanted additional steam and Kimberly-Clark did not know that the petitioner could supply steam until some time shortly prior to August 25, 1939. The two corporations entered into a contract on that day whereby the petitioner, as seller, agreed to furnish steam to Kimberly-Clark for a period of 5 years, and successive yearly periods, up to a maximum flow of 40,000 pounds per hour at a price based upon the price of coal. The steam sold was to be metered daily at the petitioner's plant and paid for by the customer monthly. The petitioner was to install steam meters and a properly insulated line between its boiler header and the outside wall of its boilerhouse. The customer was to install the necessary connections and pipeline from that point

to its plants across the canal. The petitioner ordered the material on October 23, 1939, to bring the steam to its outer wall and received an invoice for that material on December 30, 1939. It began to deliver the high pressure super-heated steam to the customer under the contract in January or February 1940. It had never sold such a product prior thereto. The delay in delivery of the first steam was apparently due to the fact that the customer needed the additional time to construct the necessary connections to take the steam from the petitioner's plant to its plants across the canal.

The taxpayer had no earnings during the base period from the sale of steam, but it derived a substantial amount of income from sales of steam to Kimberly-Clark during the taxable years. Thus its average base period net income does not reflect the normal operation of the business on which the petitioner is being taxed during the taxable years. This is the type of situation that Congress had in mind in granting relief. The furnishing of steam was a difference in the products or services furnished. It is not fatal in this case that it did not actually furnish any steam under the contract during the base period. Section 722 (b) (4) does not expressly require that the new product or service produce income during the base period. Indeed, the very fact that it was not producing normal income at the end of the base period is the reason for the granting of relief. The eventual sales began early in the following year pursuant to the contract entered into on August 25, 1939, and delivery was made through the equipment which the parties had procured in 1939. These facts distinguish this case from such cases as *Claussner Hosiery Co.*, 16 T. C. 1335. Cf. *7-Up Fort Worth Co.*, 8 T. C. 52, in regard to the new product, Nesbitt orange beverage, of which no sales were made until 1940. The fact that the boilers of the petitioner during the base period years had capacity to produce more steam than the petitioner needed and sufficient capacity to supply the needs of Kimberly-Clark is immaterial since this part of the claim is based upon a new product rather than a change in capacity. Congress has indicated that the provisions of section 722 (b) should be administered sympathetically to bring about the relief intended, and it surely did not intend to differentiate between a corporation like the petitioner and another where the only difference was that the latter actually delivered some of the new product before the end of the base period. The probable earnings during the base period from the possible sales of steam to Kimberly-Clark must be considered in determining a fair and just amount to represent constructive average base period net income of the petitioner.

The average base period net income of the petitioner is an inadequate standard of normal earnings because the taxpayer changed the character of its business during the base period and the average base period

net income does not reflect the normal operation for the entire base period of the business. The business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had made the changes in the character of its business 2 years before it did so. The requirements of section 722 (b) (4) are met.

A fair and just amount to represent constructive average base period net income of this petitioner must be computed in order to give it the relief to which it is entitled under section 722. The petitioner claims that the amount should be $142,666.59. A fair and just amount representing normal earnings to be used as a constructive average base period net income for the purpose of an excess profits tax based upon a comparison of normal earnings and earnings during the excess profits tax period, in the light of all of the evidence and material factors in this case, is $120,000 applicable to the year 1941, and $130,000 applicable to each of the years 1942 and 1943. The smaller figure reflects the application of the variable credit rule, since it is proper to adjust for the fact that in the excess profits tax year 1941 the new cooker facilities were not in full operation until the latter part of that year. *Nielsen Lithographing Co., supra; Yeast Products, Inc.,* 21 T. C. 308.

Discussion of the petitioner's alternative claim for relief under section 722 (b) (5) is unnecessary, and the problems of the petitioner's claims to the benefit of unused excess profits tax credit carrybacks are computation problems which the parties will be able to take care of.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*