OPINION. Arundell, Judge: The petitioner claims relief under section 722 (b) (4), Internal Eevenue Code of 1939, because of changes in its products, an increase in its capacity for production or operation for which it was committed prior to January 1, 1940, and a change in the ratio of nonborrowed capital to total capital. As to the changes in products, the petitioner claims that during or just prior to the base period it developed and began manufacturing several new products, including the hydropower radial pump, pressure generators, valves, controls, and other accessories, Guerin process presses, triple-action hydraulic presses, thermoplastic injection molding presses, and metal die-casting presses. Some of the products in question, such as the radial pump and the thermoplastic injection molding presses, were new products in the petitioner’s business while others were merely improvements in the products already being manufactured, or adaptations of them to different uses. The petitioner’s principal product, during the base period and for a number of prior years, was hydraulic presses. The petitioner was one of the pioneers in this field. Improvements were made from time to time in the design and construction of these presses and their uses were broadened to meet the requirements of new and expanding industries. Basically, however, they remained the same product which the petitioner began manufacturing in 1926 when it developed the oil pressure, closed-circuit press. There was, we think, no single change in design or improvement in these presses of such far-reaching effect as to constitute a change in the character of the business. See Wisconsin Farmer Co., 14 T. C. 1021; Avey Drilling Machine Co., 16 T. C. 1281; Pelton & Crane Co., 20 T. C. 967. The radial pump which petitioner began manufacturing sometime prior to the base period was one of its more important accessories. It was of the same basic design as the Hele-Shaw pump which the petitioner had been purchasing for installation in its presses before it began manufacturing its own pumps. Petitioner’s pump embodied some improvements over the Hele-Shaw pump, such as the substitution of tapered Timken roller bearings. We do not know just when the petitioner began selling these pumps. The evidence is that it had always manufactured and sold pumps of some type, also controls, valves, and such accessories. Its sales of pumps amounted to $14,168 in 1934. The evidence does not show that there was any substantial development of the petitioner’s pump after the beginning of the base period. Neither does the evidence show that petitioner would have been able to produce and sell during the base period any more presses, particularly of the heavy type for which these pumps were said to be essential, if its pump had been developed 2 years earlier, than it was. The injection molding presses, both for plastics and metals, which the petitioner began manufacturing in 1939, were new and different products for the petitioner, and their manufacture and sale in the base period may be accepted as having established a difference in the petitioner’s products. A more important change in the character of the petitioner’s business was the commitment for plant expansion. The evidence clearly shows that prior to January 1,1940, the petitioner was committed to a course of action calling for the construction of an addition to its plant. As early as 1936 the petitioner’s management recognized the need for additional space and equipment and the opportunities for expanding the business. In September 1936 the directors authorized the construction of a plant addition to handle pumps, valves, and controls at a cost of $20,000, but this was postponed, after a rearrangement of the plant and the installation of some new equipment. The lack of space and facilities for construction of heavy presses was seriously hindering the growth of the business. It was for this reason that the petitioner “farmed out” the heavy construction on several of the large presses for which it furnished the power units in 1938 and 1939. During 1939 the petitioner decided on a large-scale addition to its plant. Funds for that purpose, $740,000, were raised by the sale, through investment bankers, of additional shares of capital stock. On December 15, 1939, a construction firm was engaged to design a new factory building, and early in 1940 a contract for the building was executed. The new plant addition was put into operation in September 1940. It was especially equipped to handle the heavy machines, such as the large presses, while the old section of the plant was used to manufacture small presses, pumps, valves, and other lighter products. It was designed to give the petitioner approximately twice its base period productive capacity. We are satisfied that the addition to the plant was made pursuant to a course of action to which petitioner was committed prior to January 1,1940, within the meaning of section 722 (b) (4). See Studio Theatre, Inc., 18 T. C. 548; Springfield Tablet Manufacturing Co., 22 T. C. 35. As a further qualification for relief, the stipulated facts show that for each of the base period years there was a decrease in borrowed capital, an increase in equity invested capital, and an increase in total capital. As a consequence, there was a reduction in the interest paid on borrowed capital from an average of about $4,000 in 1936, 1937, and 1938 to zero in 1939. This constitutes a qualification for relief as “a difference in the ratio of nonborrowed capital to total capital,” under section 722 (b) (4). Petitioner has submitted a reconstruction of its average base period net income in which it contends for a constructive average base period net income of $796,358. This reconstruction is based upon all the qualifying factors contended for in petitioner’s various applications for relief and amendments thereto, the principal qualifying factor being the commitment for increased capacity set forth in the original application prior to the various amendments. In applying the push-back rule, petitioner assumes that with a 100 per cent increase in plant capacity at the close of 1937, it would have practically doubled its sales by the end of the base period and would have obtained a constructive 1939 sales volume of at least $2,830,000 as compared with its actual 1939 sales set out in our findings of $1,512,211. It is the respondent’s position that although the commitment for the plant addition resulted in a substantial increase in plant capacity, the lack of productive capacity in the base period was not a factor which limited the petitioner’s earnings to any appreciable extent, and that the evidence does not show that the petitioner would have attained any substantially higher level of earnings by the end of the base period if the plant addition had been put into use 2 years previously. The evidence is, however, that during most of the base period the petitioner was handicapped for lack of space and facilities. This caused delays in fulfilling orders and the loss of new orders. Petitioner’s management realized early in the base period that with the expansion of heavy industries and changes in manufacturing methods there would be a growing demand for its products. Subsequent events proved the soundness of that prediction. After the new plant addition was put into operation, petitioner’s sales increased from $1,512,211 in 1939 to approximately $3,000,000 in 1941, and its net profits from $355,554 in 1939 to $512,773 in 1941. The upward trend continued in 1942. However, this increase in earnings cannot be ascribed entirely to plant expansion and the changes in petitioner’s products, and we cannot assume, in applying the push-back rule, that a similar increase would have resulted by the end of 1939 if the changes had taken place at the close of 1937. In the sale of its products the petitioner was somewhat dependent upon the progress of several other large industries in which its products were used. This was particularly true of the heavy-type presses which were designed and built only at the request of and under the specifications of the purchaser. There was not the rapid expansion in those industries in 1938 and 1939 that there was in the later years; for instance, the estimated number of injection molding machines used in manufacturing thermoplastics increased from 270 in 1938 to 360 in 1939, but by the end of 1941 had increased to 900. Industrial production in the United States, as reported by the United States Department of Commerce, remained fairly stable during the base period years except for a temporary setback in 1938. We do not think there is any merit in respondent’s contention that the plant expansion was made primarily to meet the growing demands of industry in the preparation for war and should therefore be disregarded as a relief factor. The evidence is to the effect that petitioner’s products for the most part were developed for use in peacetime industries. The war situation at the end of the base period was a matter of concern to most industries, especially those engaged in the production of heavy-type machines, but prospectively petitioner’s business was affected only as were general business conditions. We cannot find on the evidence that, with the additional plant capacity in 1938 and 1939 which it had after 1940, petitioner’s sales and net profits in those years, or at the close of 1939, would have been approximately twice what they actually were. However, we are convinced that with the use of the additional plant capacity in 1938 and 1939 the petitioner would have reached a substantially higher level of earnings, attributable to the increased capacity, by the end of 1939. Making what we think is a proper allowance for the change in capacity and for the other qualifying changes referred to above, we have determined that a fair and just amount representing normal earnings to be used as a constructive average base period net income for the years 1941, 1942, and 1943 is $432,440. In an amended pleading, the respondent alleges that in the event this Court should find that petitioner is entitled to use a constructive average base period net income, then this Court must apply the variable credit rule to any such constructive average base period net income for the years 1940 and 1941. As to the application of such a rule, see Nutrena Mills, Inc., 26 T. C. 1096, and Bergstrom Paper Co., 26 T. C. 1167 and cases cited therein. Since production operations did not commence in the new plant until September 1940, it is obvious that the variable credit rule would have to be applied in determining the constructive average base period net income for 1940 and petitioner so concedes in its brief. See also Bulletin on Section 722, pps. 122 and 123. In applying the rule, however, we find that the constructive average base period net income for 1940 for carryover purposes is less than petitioner’s average base period net income under section 713 (f). It follows that regardless of respondent’s further contention regarding the timeliness of the claim, petitioner is not entitled to any carryover to 1941 of any unused excess profits credit from 1940 based on a constructive average base period net income. This, of course, does not affect petitioner’s right to any carryover from 1940 to 1941 of any unused excess profits credit based upon its average base period net income under section 713 of the 1939 Code. As to the year 1941, we think petitioner is correct in contending that the variable credit rule should not apply for the reason that during 1941 substantially the entire committed-for capacity was utilized by petitioner. Respondent further contends that for the year 1941 petitioner is not entitled to relief on any ground other than that based on the commitment for increased capacity, because that was the only qualifying factor relied upon in any claim filed within the time prescribed by statute, and that petitioner is not entitled to any carryover or carry-back of unused excess profits credit because no claim therefor was made until after the expiration of the statute of limitations for filing such claims. The timeliness of the original claim for relief under section 722 (b) (4) for the year 1941 is not questioned by respondent. His position is that petitioner is now limited to the relief based on the commitment for increased capacity as specified in the original claim without regard to the amended claims encompassing the other section 722 (b) (4) changes which were filed after the statute of limitations for such claims had expired. The amended claims on Form 991 were filed at the suggestion of the Excess Profits Tax Council at a conference with petitioner’s representatives. They were considered by the Council and by the respondent in their determination of the merits of the petitioner’s claims for relief, and the petitioner was so notified by the Excess Profits Tax Council and by the respondent. There can be no question but that the respondent was fully apprised of petitioner’s reliance in its claims for relief for the year 1941 as well as for the other years involved, upon a change in products and a change in the ratio of nonborrowed capital to total capital, as well as the commitment for a change in capacity. These are all defined as changes in the character of the business in section 722 (b) (4) on which the petitioner’s original and amended claims were predicated. It is shown, too, that extensive facts pertaining to all of these changes were submitted to the representatives of the Government and were carefully considered by them. In these circumstances, we think that petitioner is entitled to whatever constructive average base period net income may be attributed to the section 722 (b) (4) changes set out in the amended claims for 1941. The respondent, however, in an amended answer filed on March 9, 1954, alleges petitioner is not entitled to relief on any ground other than that based on the commitment for increased capacity and cites his regulations in support of his position.[1] This stand is taken in spite of the fact that respondent’s Excess Profits Tax Council and respondent both carefully considered the amended claims and the facts and information in support thereof in reaching their determination. As we read the cases, respondent’s position under the facts here present is untenable. In Martin Weiner Corp., 26 T. C. 128, we held, on the authority of six United States Supreme Court decisions,[2] that although a claim for refund may be denied if it does not conform with the formal requirements contained in respondent’s regulations, “those regulatory requirements can be waived by respondent.” The grounds which gave rise to the $4,646.45 refund in the Weiner case were not presented in the original claim nor were they ever presented in any amended claim. The matter which gave rise to the $4,646.45 refund was discovered by the respondent while considering the merits of the original claim. No objection to the petitioner’s right to receive the $4,646.45 refund was made until respondent filed an amended answer after the proceedings reached this Court. Then for the first time he contended that petitioner should be denied the refund on the ground that in accordance with respondent’s regulations petitioner had not amended its original claim by setting out specifically such so-called standard issue grounds and that it was then too late to do so by reason of the statute of limitations. This Court held that the Commissioner had waived his regulatory requirements and that the refund should be allowed. We think the instant case is stronger for the petitioner than was the Weiner case, for here petitioner, acting upon respondent’s suggestion, filed the amendments to the original timely claim. In the statutory notice, the respondent specifically stated that careful consideration was given to the original claim and to each of the amendments filed in support thereof. We hold that under the circumstances of this case the respondent has waived the regulatory requirements upon which he now relies. Martin Weiner Corp., supra, and United States v. Memphis Cotton Oil Co., 288 U. S. 62. The case of Brown Paper Mill Co., 23 T. C. 47, cited by respondent in support of his present position, did not deal with a question of waiver and we think it is distinguishable on its facts. We, therefore, hold that the matters raised in the amended claims are properly before the Court. It may be noted in passing that the respondent in his answer filed in Docket No. 45261 “alleges that petitioner has claimed the benefit of section 710 (a) (5) of the Internal Kevenue Code and thereunder deferred the payment of excess profits taxes for the taxable years ended December 31, 1942 and 1943, in the respective amounts of $94,300.55 and $111,677.84, which amounts respondent now claims as deficiencies herein.” This is a matter that should be disposed of in the computations to be made under Rule 50. See paragraphs 40 and 41 of the stipulation of facts. Reviewed by the Special Division. Decisions will be entered under Rule SO. Tucker v. Alexander, 275 U. S. 228; United States v. Memphis Cotton Oil Co., 288 U. S. 62; United States v. Humble Oil & Refining Co. (C. A. 5), 69 F. 2d 214; United States v. Garbutt Oil Co., 302 U. S. 528; United States v. Kales, 314 U. S. 186; Angelus Milling Co. v. Commissioner, 325 U. S. 293.